Joseph E. McWilliams et al., Appellees, v. The Sentinel Publishing Company et al., Appellants.

Gen. No. 44,500.

Opinion filed November 18, 1949. Rehearing denied December 6, 1949. Released for publication December 7, 1949.

SWIREN & HEINEMAN, BOWE & BOWE and LEO S. KARLIN, all of Chicago, for appellants.

MAXIMILIAN J. ST. GEORGE, of Chicago, for appellees.

MR. JUSTICE SCANLAN delivered the opinion of the court.

This is an action for libel brought by ten plaintiffs against The Sentinel Publishing Company, a corporation, publisher of "The Sentinel," a small weekly news magazine devoted to Jewish affairs; J. I. Fishbein, president of the publishing company and editor of The Sentinel, and J. M. Feldman, secretary and treasurer of the publishing company and business manager of The Sentinel. There was a trial before the court and a jury. The jury returned verdicts in favor of plaintiffs McWilliams for $9,000, Dennis for $10,000, Sage for $5,000, and Deatherage for $100. Verdicts of not guilty were returned as to plaintiffs Robert E. Edmondson, William R. Lyman and Col. Eugene N. Sanctuary. The jury was unable to agree on verdicts as to plaintiffs Ernest F. Elmhurst, Charles B. Hudson and Elizabeth Dilling. A mistrial was ordered in the cases in which no verdicts were returned and the cases as to said plaintiffs were reassigned for new

trials. Judgments were entered on all the verdicts. Defendants' motions for new trials as to the verdicts in favor of plaintiffs McWilliams, Dennis, Sage and Deatherage were denied. This appeal by defendants challenges only the judgments against them and in favor of plaintiffs McWilliams, Dennis, Sage and Deatherage.

The essential allegations of the second amended complaint are: Plaintiffs and twenty other persons were indicted, on January 3, 1944, "for conspiracy under Section 11 of United States Code 18 to violate Section 9 of said United States Code 18 in that said defendants, with intent to interfere with, impair and influence the loyalty, morale and discipline of the military and naval forces of the United States, would: (I) Advise, counsel, urge and cause insubordination, disloyalty, mutiny and refusal of duty by members of the military and naval forces of the United States; and (II) Distribute and cause to be distributed written and printed matter, advising, counseling, and urging insubordination, disloyalty, mutiny and refusal of duty by members of the military and naval forces of the United States, said cause being entitled *United States of America vs. Joseph E. McWilliams, et al.*, Criminal Court No. 73086"; that "the trial on said conspiracy charge was had in Washington, D. C., before Justice EDWARD C. EICHER, one of the judges of the Federal Court of the United States, and a jury, and said trial began on April 17, 1944, and continued thereafter to December 7, 1944, on which date a mistrial of said trial was duly ordered and entered of record because of the death of said presiding Judge EICHER"; that on December 21, 1944, defendants published in The Sentinel "a false, scandalous, malicious and defamatory libel of and concerning plaintiffs, as follows, to-wit:

"An immediate new trial of the 26 dangerous defendants" (meaning plaintiffs) "indicted for sedition, before they can succeed with their treasonous plans for bringing fascism to the United States, was urged upon Atty. Gen. Francis Biddle in a telegram sent by the National Committee to Combat Anti-Semitism, it was announced today by Dr. Emmanuel Chapman, chairman of its Executive Board.

"The defendants" (meaning plaintiffs) " 'are as guilty of treason as Benedict Arnold was in his day' and 'we would all be derelict in our duty to the men and women in our armed forces if we did not proceed with a new trial.' These defendants" (meaning plaintiffs) "must be made 'historic examples to the world that those who would betray our beloved country' " (meaning that plaintiffs were traitors who betrayed the United States of America, their country) "must pay the price for their iniquity, the telegram stated.

"The time and money spent in the first trial for the past eight months must not be wasted particularly in the face of the seditious activities of many of the defendants" (meaning that plaintiffs were engaged in seditious activities, that they were guilty of sedition) "even while the trial was going on. These included 'lectures' by Elizabeth Dilling and a compilation by Howard Broenstrupp of a list of 'prospects to whom anti-Semitic and seditious propaganda could be sent,' said the National Committee telegram.

" 'Just as in the liberated countries, the Nazi Fascist criminals are standing trial and paying for their crimes, so in our country we must make these criminals' " (meaning that plaintiffs were criminals and should be made to pay for their crimes) " 'pay before we have our black day. We must learn from the lessons of the world,' the telegram continued, according to

88

Dr. Chapman.

" 'Anti-Semitism, as Hitler used it,' namely against the life and freedom of every individual and not merely the Jews was part of the scheme of operation of each of the defendants" (meaning plaintiffs) "the telegram to Biddle added.

"The telegram in full follows:

" 'Attorney General Francis Biddle
Department of Justice
Washington, D. C.

" 'We have viewed with alarm the fact that the 26 persons indicted for treason' " (meaning plaintiffs and the other defendants were indicted for treason) " 'have used their trial as an open forum for anti-Semitic and other seditious propaganda. For eight months these Fascists' " (meaning plaintiffs) " 'have used every opportunity both in and out of court to further the plot for which they stand trial.

" 'Prosecutor O. John Rogge in his opening to the jury at the beginning of the trial clearly showed that these people are as guilty of treason today as Benedict Arnold was in his day. You would be remiss in your duty if a new trial was not immediately commenced. And we would be derelict in ours if we did not urge you in the interest of our democracy and of the tradition upon which our country is founded to commence a new trial. We would all be derelict in our duty to the men and women in our armed forces if we did not go ahead with a new trial and defend at home what they are giving their blood and lives for on the field of battle.

" 'Your office is aware that a number of the defendants' " (meaning plaintiffs) " ' even during the trial were conducting their activities in furtherance of their seditious plot. Howard Broenstrupp has been copying lists from the record so that he can use them in the transmission of anti-Semitic and treasonous material. Elizabeth Dilling has been lecturing, if it can be called

89

that, in the Midwest spreading poison against our democracy and against our Commander-in-Chief.

" 'The Committee for which I speak, the membership of which is non-sectarian and represents a cross section of the great American people, is dedicated to the proposition that anti-Semitism in any of its forms serves fascism and must be eliminated to safeguard the American way of life. All the defendants' '' (meaning plaintiffs) " 'used anti-Semitism as Hitler used it, not merely against the Jews, but against every individual.

" 'We urge that the time and money spent by our country in the past eight months in prosecuting these dangerous criminals should not be wasted. We demand that a new trial be started at once and that the defendants' '' (meaning plaintiffs) " 'be brought to the bar of justice as historic examples to the world that those who would betray our beloved country pay the price for their iniquity.' '' (meaning plaintiffs betrayed their country and were guilty of treason) " 'Just as in liberated countries the Nazi Fascist criminals are standing trial and paying for their crimes so in our country we must take [make] these criminals' '' (meaning plaintiffs) " 'pay before we have our black day. We must learn from the lessons of the world. We must act now. Some of the members of the National Committee are: Prof. Millar Burrows, Cong. Louis J. Capezzoli, James B. Carey, Dr. Emanuel Chapman, Cong. Emmanuel Celler, Cong. John M. Coffee, Norman Corwin, Bishop Wm. R. Cruickshank, Bishop Ralph S. Cushman, S. H. Dalrymple, Cong. Samuel Dickstein, Cong. James H. Fay, Lion Feuchtwanger, Albert J. Fitzgerald, Father George Ford, Cong. Robert Grant Furlong, James W. Gerard, Clinton S. Golden and Patrick E. Gorman.' ''

90

The complaint further alleges that "the direct statements and innuendos contained in the said publication falsely charge that plaintiffs were traitors to the United States of America, that they were engaged in seditious activities, that they were dangerous criminals, that they were guilty of crimes and that they were pro-fascists, this country being at war with the Axis powers. That the statements in said publication were wholly false and by reason thereof, plaintiffs, and each and every one of them have been injured in their reputation, business, credit and profession and brought into public hatred, contempt, ridicule, scandal and disgrace, and have been and are shunned and avoided by divers persons, and have lost divers clients who otherwise would have come to them and from whom plaintiffs would have received various fees and emoluments; and plaintiffs have been otherwise injured"; to the damage of plaintiffs, etc.

Defendants interposed a plea of truth, published for good motives and with justifiable ends, and in support of their plea they had a right to prove that the technique of plaintiffs followed precisely the Nazi pattern and was part of a seditious conspiracy to divide the people of the United States, and to promote discord, defeatism, dissension and disunity in time of war. Plaintiffs would have had the right to rebut, by competent evidence, the defense interposed, but, as will presently appear, when it came time for rebuttal the trial proceeded upon entirely false and highly prejudicial issues.

Defendants, at the outset, earnestly contend that they were deprived of a fair trial by the conduct of plaintiffs, their counsel, and the trial court, and that plaintiffs were allowed to try the case upon the theory that they represented Christianity and Americanism and that defendants were Jews, anti-Christians and Communists; that The Sentinel was anti-Christian;

that plaintiffs were allowed to introduce wholly incompetent and highly prejudicial evidence; that counsel for plaintiffs were allowed to make inflammatory and prejudicial arguments to the jury and were allowed to argue to the jury that the B'nai B'rith and its adjunct, the Anti-Defamation League, were two powerful Jewish organizations that had raised $6,000,000 to combat anti-Semitism; that these organizations would pay any damages assessed against defendants; that said organizations were part of a conspiracy against plaintiffs. Defendants insist that the verdicts were the result of passion and prejudice induced by plaintiffs and their counsel.

It is urged that practically all of the testimony of plaintiffs McWilliams and Mrs. Dilling was wholly incompetent and that it seriously prejudiced the rights of defendants. The two witnesses boasted of their rabid anti-Semitism, and it is a reasonable assumption from the nature of their evidence that they took the stand, not to testify to facts material to the issues, but to voice, in an American court, their hatred of Jews, their religion, the Anti-Defamation League, the B'nai B'rith, and especially prominent American Jews. McWilliams was one of the defendants in the sedition trial prosecuted by the United States in the District Court of the United States for the District of Columbia. He was the leader of the Christian Mobilizers, an organization that had aims similar to those of the German-American Bund. In his testimony he stated that he had made numerous public statements commending the ''New Germany'' and describing Hitler as a great political leader; that in one of his speeches he compared a party organized by him (McWilliams), the American Destiny Party, with the beginning of Hitler's party, ''born in a beer cellar with 7 members,'' and that in the same speech he stated that in ten years, ''when American Destiny Party is the leading party

92

of the United States, there won't be a Jew in it." He admitted that he had stated in so many words that Hitler was in many respects the greatest organizer and leader of men since the time of Jesus Christ; that Fritz Kuhn was the great leader of the German Bund and that "the Roosevelt administration through its Jewish stooges in the American judicial system made it possible to take away a man's citizenship rights if they happened to be in disagreement with the Rooseltian politics"; that Kuhn's citizenship was taken away from him "because he didn't agree with Roosevelt and the Jews" and that "it was done at the instigation of such men as Felix Frankfurter and such other fellows who were in the American judiciary." He further testified, "I believe that he [Roosevelt] was a war criminal."

Elizabeth Dilling in her testimony made vicious, inflammatory and prejudicial statements about Jews; their religion; their sacred book, the Talmud; the Anti-Defamation League; the B'nai B'rith, and prominent Jews. Some of her testimony is of such a malignant and inflammatory nature that we purposely refrain from mentioning such parts. She testified that she had written several books in which she violently attacked Jews and prominent Jewish organizations; that she had denounced the Talmud as a criminal book. She further testified that Hitler was an amateur compared to the Talmud; that certain powerful Jewish organizations smeared any person who criticised Jews; that she had written a book, "Roosevelt's Red Record and Its Background," for the purpose of showing Jewish influences back of President Roosevelt; that "President Roosevelt had a tinge of Jewish blood in him"; that in a bulletin or pamphlet she issued in November, 1946, called, "Authorities on the Jews," she "had taken up the Bible showing that the heirs of Abraham are those who had Christ crucified." One

of the most malignant statements in her testimony is the following: That "if the Christians knew what it was, they would not be taken in by this Brotherhood bunk. There is no brotherhood between the Christian and Judaism." This statement is a paraphrase of statements made by Hitler in his propaganda against the Jews, and it, together with other portions of her testimony, shows how closely she followed the anti-Semitic technique of Hitler. As to her last statement we are impelled to state that in the United States the relations between Christians and Jews are steadily becoming more fraternal.

Defendants contend that outrageous, inflammatory and prejudicial arguments were made to the jury in plaintiffs' behalf and that the trial court grievously erred in permitting them to be made without rebuke. Plaintiff McWilliams was not a lawyer and was represented by counsel. He was permitted, however, over the objection of defendants, to make an argument to the jury. In view of the nature of his evidence the trial court might well have sustained the objection of defendants. He began his argument as follows:

"Your Honor, ladies and gentlemen of the jury, Mr. Bowe, Mr. Casey, the anti-Defamation League, and I suppose the Communist Party:"

He proceeded:

"Now, the first thing I want to say to you and impress upon you with all solemn sincerity of which I am capable, is this: That you are gathered here on a solemn occasion, one of great import not only to the men and women who are defendants—or who are complainants in this case, plaintiffs in this case, but to your daughters and your sons and your family, to the United States, to Christianity, civilization, and the Western World.

"Now, I say that advisedly and after careful thought for this reason; I can tell you as a student of Communism and its long history and history of the Jewish movement that has a history 4,000 years of age, that the principal weapon of Communism everywhere, the principal weapon of the Jewish race in its effort to carry over nations through all history has been one thing; character assassination.

". . .

"Oh, it is an old technique. It is simply character assassination, it is salaciousness of the worst kind and that has worked for 4,000 years for the Jews against many men in many nations. It has worked for the Communist Party since its inception under the direction of Marx and Engels, and now, I am not saying that these men here are all Communists. I don't know.

"I don't think some of them are smart enough to understand the meaning of dialectic materialism, but I say that they are spiritual allies. They are the creators. Out of their spirit was created Communism, and I say that to you carefully as a man who once, to a degree, sympathized with the aspiration of the Communist Party in America, a man who was the leader of the Communist Movement in the United States for over a period of ten years.

". . .

". . . This is, essentially, a very simple case. I am a criminal or I am not. And if I am a criminal there are records to prove it and this man, Bowe, could find them with all the power of the anti-Defamation League behind him. I am a traitor or I am not. And if I am a traitor I will assure you this; I wouldn't be standing here. The Roosevelt Administration or Frankfurter and Rosenman would have sent me to death a long time ago if I had been a traitor, because a traitor is a man who is a traitor to his country in a time of war.

" . . .

"Ladies and gentlemen, I say this after careful thought, you are twelve citizens of the State of Illinois gathered here from your homes and offices. You might not have a true understanding of what lies in your hands, but I want to tell you that I believe that in your hands today represents the power to destroy a weapon that is controlled by the Communists and the Jews of this nation and their allies that is dangerous to the welfare of the Americans as was the atomic bomb to Japan, because if they can destroy every man who knows something about Communism; destroy every man by libel and by character defamation who understands the nature and the method of Jews and the Communists, and I say to you that there is proof they are much the same thing, then they can destroy the power and the will of resistance against the coming of Communism to the United States.

"That is the weapon that you have the power to destroy. I am the initiator of this case and I insist that it be brought—that it be fought to a final conclusion here under the laws of the United States, that the highest propaganda that is represented by this magazine guided by the anti-Defamation League, the Jews and the Communists of the world can be ended and that is your power, it is within your power to stop that tide of propaganda.

"Victory here for the plaintiffs will end this tide of vituperation and libel for a generation. That I am convinced of.

"Now, I admit that I am anti-Jewish. I don't equivocate on that matter. My study of history convinces me that the Jews are the originators, the engine of the mighty power behind the Communist movement. I could prove it to you if I had the time; prove it from their own words, from the writings of reputable historians and from the records, but I haven't the time.

" . . .

"They are going to try to prove that we were anti-Jewish. You don't have to prove that, in my case at least. I have admitted it for the last seven or eight years. I am proud of it. I wear it like a red badge of honor.

" . . .

"Now, it does happen that I, to a degree, openly have agreed with the Germans about the nature of the Jewish problem, about its extent. I never have agreed with Hitler about the nature of its origin. I have made more independent research than Hitler ever did, I'm sure, on the subject of Jewish history.

"Now, I am going to outline to you briefly a little bit about that history—

" . . .

" . . . I will just say this:

"That although I disagree with the Roosevelt, Rosenman, Frankfurter administration about America's foreign politics in the period before the World War, I disagreed then with all the ability I had. They were better organizers and better propagandists and had more resources than we, but they were able to take us into the World War. I was aware of the fact in October, 1941, that we were actually then involved in war."

Defendants complain of the argument made by plaintiff Dilling's counsel and also the argument made in her behalf by her son, Kirkpatrick W. Dilling. Plaintiff Dilling had testified that the Talmud authorized certain "criminal practices such as sodomy." To rebut this testimony defendants called as a witness Rabbi Stephen W. Wise, who testified that perverted sex practices were not authorized by the Jewish religion. Counsel for Mrs. Dilling, after referring to her testimony and the testimony of Rabbi Wise, stated that

97

Rabbi Wise "loathes everything that these Christian plaintiffs stand for"; that The Sentinel was part of the Jewish smear bund that was responsible for the wrongful indictments of the defendants in the sedition case in the United States District Court of Washington; that the Anti-Defamation League was raising $6,000,000 this year to fight anti-Semitism, "in other words, to stop any criticism of Jew or Jewry that they do not like." The counsel closed his argument as follows: "Now, you have already been exhorted to weigh the facts carefully in this case, the importance of your decision has been pointed out to you and that is particularly important for this reason: you or some member of your family might become the victims of this Jewish smear bund that has been doing nothing for many, many years except to smear a good patriotic woman just because she is out fighting for Christianity and Americanism against Communism." Kirkpatrick W. Dilling, in his argument to the jury, made the following statements: "But I am here today to talk for just a short while not only to uphold my mother's good name, but the cause of Christ, our Lord Jesus Christ, and Americanism for which He [she] stands." After reading a statement from his mother's book, "The Octopus," he commented upon that statement as follows " 'Is there anything permitted to a Jew which is immoral, unnatural intercourse is permitted to a Jew.' Now ladies and gentlemen of the jury, I am not going to go into the sex angle. That is just one line from the Talmud and it is full of that same kind of stuff. Now, is it un-Christian to criticise that sort of thing which is prohibited by every criminal law?" The counsel then stated his mother was attacked because she was pro-Christian; that The Sentinel was anti-Christian; that she was anti-Communist and The Sentinel was pro-Communist. In closing his argument he stated:

98

"Ladies and gentlemen of the jury, perhaps you remember Mrs. Dilling was sitting there on the stand and these pictures were shown to ·her, pictures that she took in Spain where they had taken the head of our Lord, Jesus Christ, and they knocked it in the mud, where these Fascist anti-Christians just went to work with everything they could to destroy the name of Christ, to obliterate and turn the churches into death halls and to put their stuff over.

"What does Mrs. Dilling stand for? She stands for Christianity and Americanism.

"Now, ladies and gentlemen of the jury, a verdict for these people, these pro-Communists, anti-Christian people would be a verdict for Communism and for Joe Stalin. A verdict for my mother, Mrs. Dilling, and the rest of these people is a verdict against Communism and for Christianity and Americanism."

In our consideration of this appeal we found it difficult, at first, to believe that the evidence and the arguments to which we have referred form a part of the transcript of the record of a trial in an American court. The "testimony" of plaintiffs McWilliams and Mrs. Dilling consists practically of wild attacks upon Jews, their religion, and Jewish organizations, although there is not the slightest competent evidence to warrant the attacks. The "arguments" in behalf of plaintiffs to which we have referred are mere vicious, rabble-rousing appeals to religious and racial passions and prejudices, and the harm done to defendants by the appeals was greatly aggravated by the fact that the court remained silent while they were made, although the "arguments" constituted a grave affront to justice. Certain questions naturally arise: Why did the trial court permit the evidence of McWilliams and Mrs. Dilling to be given, and why did he allow such arguments to be made, when he should

99

have taken drastic steps to protect the rights of defendants? Upon the motion for a new trial the evidence of plaintiffs McWilliams and Mrs. Dilling and the arguments made on behalf of plaintiffs were pointed out to the trial judge, and in denying the motion he gave an opinion that throws some light upon his attitude throughout much of the trial. The following are the relevant parts of the opinion:

*"An issue developed which I was sorry to see but it developed and I think legally into a Jewish and anti-Jewish business* but there again it was the defendants themselves, who insisted that that testimony should go in and I decided it should over the objections of the plaintiffs, who said it had no place in the case. I said they were trying to prove plaintiffs were Nazi and could prove they were anti-Jewish; that that was one element in proving they were Nazi. So I sided with Mr. Bowe [attorney for defendants] in that matter and allowed that evidence in. I think most of the testimony was reading from articles and so forth of these plaintiffs here on the anti-Jewish business. It kept going of course as those things do and the trial embraced a whole lot of that. I still think it was legally in the case although it took quite a little time but as I say, it was at the instance and request of the defendants that it was done. The case was long and arguments had been made as to some things that happened during the case; some of the instructions and some of the testimony regarding the backing by some wealthy group. I do not believe that that verdict would have been affected by it. I cannot say it was wrongfully in because of the odd law, which I did not even want to accept until it was proven to me, that in a libel case, different from any other case, you can show the wealth and so forth of the defendants. I do not see why a miser with millions of dollars in the vault should

100

be any worse as a libelor than a poor man, if he says a thing. Many a wealthy man has no publicity organ like the plaintiffs with their books and the defendants with the newspaper and yet the law apparently allows it. It allows it on the ground I read. That does not appeal to me at all, but I allowed in evidence the assets, and whether the evidence of the source of the defense funds was wealthy groups or anything of that kind is objectionable, I cannot say because as I say the law to me is all wrong that it even allows it at all.

"*I do not see anything wrong with the trial of this case.* We tried these things day after day and this went on 2½ weeks, a hard fought case. Lawyers in most every case, especially defendants on verdicts make motions for new trials and cite various grounds as you have heard them and the various grounds all put together make this sound like a terrible trial. If you sit in the Judge's place and hear the same thing on practically all plaintiffs' verdicts, you cannot quite assume them defects in the trial either way or that any one is any more terrible than another. We have one trial in a jury court and outside of an especially erroneous action, anything else is up to the Appellate Court. If the trial court has done wrong, they will so say. Why to me, aside from the type of evidence and the combative trial—I had worse ones than this. *To me it is just another case with ordinary, normal and quick decisions made and normal complaints and answers. I would say if the case was tried tomorrow or a month from tomorrow by me, I don't know of any different decision, after listening to your arguments, that I could make. I do not know of any different way I could conduct it myself.*

"*. . .*

"*This is just another trial lasting for a certain period of time and the various grounds set forth for a New Trial do not mean to me that this case should be*

101

*tried again because I do not see any different way it could be conducted or law given than I gave.*

"...

"... I cannot say there is any showing that these verdicts were anything but the jury's conscientious and legal decision."

It appears from the opinion of the court that he thought that *"a Jewish and anti-Jewish business" was legally in the case* and that if he tried the case again he did not see any different way he could conduct it. He stated that he saw nothing wrong with the trial of the case and, therefore, it is clear that he considered the evidence of plaintiffs McWilliams and Mrs. Dilling competent and the arguments made on behalf of plaintiffs proper. He approved the "conscientious and legal" verdict of the jury. In his opinion and during the trial he followed the false theory advanced by plaintiffs that a fight between Christianity and Jews was involved in the case because of certain evidence introduced by defendants in support of their plea; that because of that evidence a door was opened that warranted the admission of the evidence of plaintiffs McWilliams and Mrs. Dilling and justified the attacks made in the arguments in behalf of plaintiffs. The trial court *ignored or failed to note that neither in their plea nor in their evidence did defendants make any attacks against Christianity or Christians;* that that phase of the case was deliberately injected into the trial by plaintiffs to prejudice the rights of defendants. In support of their plea that the charges made in the article were true, defendants offered proof that plaintiffs were pro-Nazi and were engaged in a conspiracy to divide the people of the United States and to affect their morale, and that in furtherance of the conspiracy they followed Hitler's anti-Semitic technique. It is established that anti-Semitism was a car-

dinal tenet in Hitler's propaganda to divide the people
of Germany and thereby gain control of Germany. As
the result of Hitler's anti-Jewish propaganda the aw-
ful purge came, and the world will long remember that
as a result of it millions of innocent Jews were mur-
dered. Hitler declared that mass propaganda was an
essential part of his plan to gain control of Germany.
Mr. Justice JACKSON states in 1 Nazi Conspiracy and
Aggression (U. S. Government Printing Office 1946),
p. 134:

"Anti-Semitism was promoted to divide and em-
bitter the democratic peoples and to soften their resist-
ance to the Nazi aggression. As Robert Ley declared
in Der Angriff, on 14 May, 1944 'The second German
secret weapon is Anti-Semitism because if it is con-
stantly pursued by Germany, *it will become a universal
problem which all nations will be forced to consider.*'"
(Italics ours.)

That seditionists in the United States have followed
Hitler's anti-Semitic technique, see *United States v.
Pelley,* 132 F. 2d 170, in which case Pelley was found
guilty of sedition. The government proved that Pelley
published articles in a certain publication and issued
certain documents that were treasonable in their na-
ture, and that in nearly all of the articles and publica-
tions Hitler's anti-Semitic technique was followed.
An able American observer of events has stated that
"modern revolution has its propaganda technique."
It has been noted by many writers that religious and
racial propaganda is most likely to be effective.

 In support of their plea defendants had a
perfect right to prove, *inter alia,* that the anti-Semitic
technique of plaintiffs was a part of a seditious con-
spiracy to divide the people of the United States and
to break their morale. We repeat that in none of that
proof was Christianity, or Christians, attacked in any

103

way. As previously stated, plaintiffs had a right to rebut by competent evidence the defense interposed, but that right did not give them a license to turn a trial in an American court into a forum where witnesses and lawyers, in the manner of rabble-rousers, could make wild and outrageous utterances against Jews, their religion and organizations, when there was not the slightest competent evidence in the case to support the charges. In their rebuttal plaintiffs offered not facts but merely the opinions of rabid anti-Semites. The purpose of plaintiffs during the trial is obvious. The real issue in the case was whether plaintiffs were pro-Nazi, and whether they had engaged in the conspiracy charged in the indictment. Instead of meeting that grave and embarrassing issue they sought to becloud it and to win the case through wild statements of witnesses and lawyers that the trial involved a contest between Christians and civilization on the one side and dangerous Jews upon the other.

██ The outrageous record presented resulted from the failure or refusal of the trial judge to hold plaintiffs or their counsel to an orderly trial of the case. He made it clear in several instances that he was not able to remember the evidence, and accordingly acted on the novel theory that he would leave the propriety of the arguments to the jury and the self-discipline of counsel. At one point in the argument defendants requested the court to direct plaintiffs' counsel to confine himself to the evidence. The court said: "I will leave it to the jury—in the many days we have been here counsel have covered in two weeks, all the things they have covered in two weeks the Court can't always remember, but the jury will have to do their best and leave it to counsel to see that they stay within the evidence." Later, when a dispute arose between counsel as to the closing argument on behalf of plaintiffs, the court again said: "The jury can remember as

best they can. I'm not ruling." And shortly thereafter, in response to an objection by defendants' counsel to a portion of the closing argument, the court once more stated: "I don't think it should be repeated, unless it is shown in the evidence. I don't know." As counsel for defendants pertinently observe, "there is an ever growing recognition that a trial court is not a robot"; that "he must act in the public interest of justice to curb inflammatory arguments productive of verdicts resting on passion and prejudice." In *Englund v. M. V. Traction Co.,* 139 Ill. App. 572, 580, it was held under similar circumstances to be "the duty of the court to control counsel within reasonable bounds and to restrict the argument to the evidence in the case."

█ Defendants contend that instruction 55, given to the jury *on the court's own volition,* was improper and highly prejudicial to defendants, and that it greatly aggravated the harm done to defendants by the evidence of plaintiffs and the arguments made in their behalf. The instruction reads as follows:

"The court instructs the jury that anti-Semitism or dislike for the Jews is not of itself a criminal offense and that the evidence on the issue of anti-Semitism has been admitted in this case in connection with the use of that word or phrase in the published article and *also in connection with the claim of the defendants that anti-Semitism was one of the tenets of Naziism and one way of proving a person a pro-Nazi."* (Italics ours.)

Defendants argue that this instruction is bad for a number of reasons, but, in our judgment, the following reason, alone, demonstrates that it is erroneous and highly prejudicial. Whether "anti-Semitism or dislike for the Jews," "of itself" constituted a criminal offense, was not an issue in the case.

105

Defendants contended that the anti-Semitic technique practiced by plaintiffs was a part of the conspiracy charged in the indictment against them and that it was used to divide the people of the United States and to affect their morale. Expressions of anti-Semitism and dislike of the Jews *if made in furtherance of the conspiracy charged* would be, in law, treasonable utterances. That the trial court in this instruction ignored this important principle of law intentionally, appears from the following words in the instruction: "also in connection with the claim of the defendants that anti-Semitism was one of the tenets of Naziism and one way of proving a person a pro-Nazi." By this instruction the jury were practically told that in determining whether defendants had proved the truth of the charges the jury should disregard the proof offered by defendants as to the anti-Semitic propaganda practiced by plaintiffs.

██ Defendants contend that it was reversible error for plaintiffs' attorneys to inject into the minds of the jurors that the Anti-Defamation League and the B'nai B'rith were very wealthy Jewish organizations and that they would pay any judgments rendered against defendants. As there was no evidence to show that these organizations would pay any part of any judgments rendered against defendants the conduct of plaintiffs' attorneys was highly improper and prejudicial.

██ Plaintiffs contend in their brief that the judgment in the sedition case (*United States v. McWilliams et al.,* 69 F. Supp. 812) amounted to a finding that plaintiffs, the defendants in that case, were not guilty of the charges made against them and that therefore defendants' plea of the truth of the charges failed. Upon the oral argument plaintiffs' counsel, when interrogated by the court, admitted that the judgment in the Federal court did not have the effect he claimed in his

brief, but as this admission is not part of the record, we will briefly state the history of the sedition case: The ten plaintiffs in the instant case were among thirty defendants who were indicted by a Federal grand jury for the District of Columbia for conspiracy to interfere with, impair and influence the loyalty, morale and discipline of the armed forces of the United States, and for conspiracy with Nazi officials of the German Reich for the overthrow of democratic government (*United States v. McWilliams et al.*, 54 F. Supp. 791). The trial of the case commenced on April 17, 1944, and continued until December 7, 1944, at which time a mistrial was declared because of the death of the presiding judge. Thereafter the prosecution failed to bring the cause to trial in due course and the District Court of the United States for the District of Columbia (*United States v. McWilliams et al.*, 69 F. Supp. 812, *supra*) held that such failure constituted a denial of the defendants' constitutional right to a "speedy trial," and the motion of the defendants to dismiss the cause was sustained. The order of dismissal was clearly not a determination of the case upon the merits.

Plaintiffs argue that defendants offered no sufficient proof in justification of the truth of the libel and therefore their plea failed. In answering this contention we will refer only to evidence produced in support of defendants' plea insofar as it affects plaintiffs McWilliams, Dennis, Sage and Deatherage, who obtained verdicts and judgments against defendants in the instant case. We have heretofore referred to evidence that bears against plaintiff McWilliams and need not repeat it. Defendants' proof that plaintiffs were extreme and active anti-Semites was not contested; in fact, all plaintiffs save Dennis boasted of their hatred of the Jews and their religion.

107

Plaintiff Dennis was the author of "The Coming of American Fascism," which, to use his own words, consisted of an *"undertaking to rationalize Fascism before it became an accomplished fact in the United States."* In 1936 and until long after Pearl Harbor Dennis kept hammering upon his theme that totalitarianism was the only political and economic form that could cure America's ills. In books he wrote, in speeches he delivered, in weekly publications, Dennis spread his propaganda condemning democracy and extolling the dictatorships of Germany and Italy. After the entry of the United States into the war he published "The Weekly News Letter," which was filled with defeatist propaganda calculated to incite disaffection for our government and its conduct of the war, propaganda that struck at military and civilian morale and praised Fascist forms of government.

Plaintiff Sage was the treasurer of the National Workers League, which published the "National News Letter," and which was anti-Jewish. That publication called the Lend-Lease Bill a traitorous act. Sage and his colleagues wrote of Hitler Germany as the saviour of the world and followed Hitler's propaganda line of attacking "the world's most degenerate political system—Jewish communism." After the entry of the United States into the war Sage predicted total defeat of Great Britain and the United States within sixty days.

Plaintiff Deatherage was the national commander of the Knights of the White Camellia, which had affiliated branches in Nazi Germany and Fascist Italy. He organized the American Nationalist Confederation, which had the swastika for its emblem, and he wrote a speech entitled, "Will America be Jewry's Waterloo?" which was to be presented before the International Congress at Erfurt, Germany, and he also wrote that "Fascism is America's only solution." We

108

are satisfied that defendants made out a *prima facie* case, at least, in support of their plea that the charges were true, and in reaching that conclusion we took into consideration the fact that plaintiffs were charged with conspiracy in the indictment and that therefore the law relating to conspiracy had to be considered.

■ ■ Plaintiffs contend that defendants failed to properly preserve for review alleged errors as to evidence and arguments. If this were an ordinary case there might be some force in the contention, but the record presents an extraordinary case. The attitude of the trial court as to the "Jewish and anti-Jewish business" became so clear at an early part of the trial that counsel for defendants, as they now argue, would have aggravated the situation and tended to prejudice the jury against them by constantly making objections. As appears from the opinion of the trial court denying a new trial, the court was then still of the opinion that "a Jewish and anti-Jewish business" was legally in the case; that he did not see anything wrong with the trial of the case nor did he know of any different way he could conduct himself, and that if he were to try it again he would conduct the case in the same manner. It is clear, therefore, that it would have been useless and unwise for defendants' attorneys to make continuous objections to the evidence and the arguments. It is our judgment that when plaintiffs started to becloud the real issues by making violent and outrageous attacks upon Jews, their religion, and their organizations, and injecting into the case the false theory that it was a contest between Christians and Jews, the trial court should have, *sua sponte,* taken drastic steps to protect the rights of defendants (*United States v. Grayson,* 166 F. 2d 863, 871), but we regret to state that at no time did he rebuke plaintiffs or their counsel, or even attempt to restrain them. After a careful study of the trial court's opinion and instruction num-

ber 55, that he gave of his own volition, we are forced to the conclusion that he saw nothing to disapprove in the testimony of plaintiffs nor in the arguments of their attorneys, and that he considered the verdict of the jury to be a conscientious and legal one. We are satisfied that there was a grave miscarriage of justice in this case.

The judgment order of the Superior court of Cook county entered December 3, 1947, insofar as it relates to Joseph E. McWilliams, Lawrence Dennis, E. J. Parker Sage and George E. Deatherage, plaintiffs, v. The Sentinel Publishing Company, a corporation, J. I. Fishbein and J. M. Feldman, defendants, is reversed, and the cause as to them is remanded for a new trial.

*Judgment order entered December 3, 1947, insofar as it relates to Joseph E. McWilliams, Lawrence Dennis, E. J. Parker Sage and George E. Deatherage, plaintiffs, v. The Sentinel Publishing Company, a corporation, J. I. Fishbein and J. M. Feldman, defendants, reversed, and cause as to them remanded for a new trial.*

FRIEND, P. J., concurs.

SULLIVAN, J., specially concurring: I agree with the conclusion reached by the court, but not with all that is said in the opinion.