537 P.2d 1345

**PHOENIX NEWSPAPERS, INC., a corporation, Eugene C. Pulliam and Michael Padev, Appellants,**

v.

**Wade CHURCH, Appellee.**

**No. I CA–CIV 1990.**

Court of Appeals of Arizona,
Division 1,
Department B.

July 15, 1975.
Rehearing Denied Sept. 11, 1975.
Review Denied Dec. 9, 1975.

Snell & Wilmer, by Mark Wilmer, Phoenix, for appellants.

Goldstein, Mason, Bistrow & Ramras, Ltd., by Philip T. Goldstein, Phoenix, and Tonkoff, Dauber & Shaw, Yakima, Wash., for appellee.

## OPINION

HAIRE, Chief Judge, Division 1.

This appeal results from judgments entered in an action for damages for civil libel brought against a corporate defendant (Phoenix Newspapers, Inc.), its president and publisher (Eugene C. Pulliam) and its foreign affairs editor (Michael Padev). The plaintiff, the Attorney General of the State of Arizona, at the time of the alleged libel, claimed damages based upon an editorial written by the defendant foreign affairs editor and published in the corporate defendant's newspaper with the approval of defendant Pulliam.

This is the second appeal in this matter. *See* Phoenix Newspapers, Inc. v. Church, 103 Ariz. 582, 447 P.2d 840 (1968). The first trial resulted in a jury verdict and judgment against the defendants for $30,000 actual and $20,000 punitive damages. The defendants appealed from the first judgment and the Arizona Supreme Court reversed, holding that the instructions to the jury concerning actual malice did not comply with federal constitutional requirements enunciated in New York

Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Upon retrial, the jury awarded the plaintiff $250,000 actual damages and $235,000 punitive damages against each of the defendants.

Inasmuch as the evidence introduced during the second trial was in most respects substantially identical to that introduced in the first trial, we will not attempt to set forth the background facts pertinent to the libel claim. These facts have been stated in detail by the Arizona Supreme Court in its prior opinion, and the reader is referred to that opinion for the background facts essential to an understanding of this opinion.

On this appeal the defendants present some fourteen separate questions as a basis for reversal. Where appropriate, we will combine various of these questions for purposes of discussion.

## THE ALLEGED MISCONDUCT OF PLAINTIFF'S COUNSEL

In the first three questions presented, defendants complain of assorted instances of alleged misconduct and prejudicial statements by counsel during the course of the trial and during jury argument. Defendants contend that, taken collectively, a pattern of intentional misconduct is shown which constitutes *fundamental* error effectively denying defendants a fair trial.

One of the complaints involved jury argument by plaintiff's counsel, who quoted as factual an alleged conversation between the publisher, Pulliam, and the foreign affairs editor, Padev, which never took place. Examples of such quoted fictitious statements are:

"Mr. Pulliam, who was not a gentle man—he might be a gentleman, but not a gentle man, he said, 'Don't you let Marquardt write that editorial. I want you to indulge in the tactics that you well know is employed by the communists. I want you to pervert the truth in this case,'

\* \* \* \* \* \*

'I want you to write an editorial which will connect him up with communist philosophy. That is the surest way to end this Attorney General's career.'

\* \* \* \* \* \*

"And without any consideration saying, 'Annihilate him, Padev. You adopt that arrogance—' that you saw demonstrated on the stand, refusal to abide or answer any questions, '—you pervert the truth in this case. That's another trait. In your godless way, annihilate him.' You have to teach the publishing company here."

■ Defendants complain that the foregoing statements were improper because of the lack of any evidentiary basis, and urge that they were highly inflammatory and prejudicial to the defendants. We tend to agree, although from our position it is difficult to assess the depth of the effect which these statements may have had on the jury. In this connection, we note that there was no objection to these statements at the time they were made, nor was there any request for a mistrial or for a curative instruction prior to the time the jury retired. Also, although the defendants filed a motion for a new trial, they did not raise any issue therein concerning these statements so as to give the trial judge an opportunity to consider their possible impact on the jury. For these reasons, we do not consider that, in and of themselves, these statements, although improper, constitute a sufficient basis for reversal.

■ Defendants also contend that fundamental error resulted from questions by plaintiff's counsel in the course of trial concerning the results of his campaign for re-election, despite the fact that the court had prior thereto ruled that the defeat of plaintiff was inadmissible. It is true that the trial judge instructed the jury that it should attach no significance to the fact that the plaintiff was not re-elected Attorney General. Although in their opening brief defendants refer to a ruling of the court that such evidence was inadmissible, no reference is made, in either the opening or reply briefs to the transcript relating to

this ruling. Plaintiff asserts that no such ruling was made, and we have found none.

■ In addition to the foregoing, defendants also complain that plaintiff's counsel repeatedly misrepresented the substance of the allegedly libelous editorial to the jury by stating that the editorial in fact called the plaintiff a communist.

The record does reveal that plaintiff's counsel made such representations repeatedly, both in the form of questions while examining witnesses and during jury arguments. Typical examples are found in counsel's jury argument as follows:

"You recall at the outset of this proceeding, when I addressed you, I told you that you must accept as a fact, or you must accept as a firm and conclusive hypothesis that the editorial, as a matter of law, charged Mr. Church with being a communist and advocating a communist sympathy dedicated to the violent overthrow of the democratic process. This you must start with.

\* \* \* \* \* \*

"So in effect what this Court is telling you at the outset, and which you must accept as the gospel, is that this defendant newspaper, by the publication of this article, called this man a communist and ideologically sympathetic with the communist ideology of violent overthrow of our democratic institutions. What the law is saying is that there is no argument about this, because to call a man a communist, we say, is to cast him in the well of loneliness, is to cast him in a situation of opprobrium and, therefore, we say, as a fact, historically now, that to call a man a communist is to engage in licentious publication. That's what this case is about. I say to you, ladies and gentlemen, that the defendant in this case forfeited its right to the protection and mantle of the First Amendment, and entered into the domain of licentious publication by calling this man a communist, especially when they did not believe that this man was a communist or was

ideologically sympathetic with the communist way of life."

This Court recognizes that the editorial here involved did not in so many words directly label plaintiff a communist or a communist sympathizer. Such a conclusion, if to be drawn at all, must result from inferences drawn by the reader from the total contents of the editorial. However, plaintiff's counsel's remarks must be considered in the context of the prior rulings made in this case, with particular consideration being given to the Arizona Supreme Court's opinion on the prior appeal. In that opinion, one of the major issues discussed was whether the trial court had erroneously ruled prior to trial that the editorial was libelous per se. Over the defendant's strenuous contentions that, at most, the editorial was susceptible of two meanings, one libelous and the other non-libelous, the Arizona Supreme Court upheld the trial court's ruling that the editorial was libelous on its face, that is, libelous per se.[1]

This holding constituted a finding that, as a matter of law, and without resort to evidence other than the face of the editorial, it was such as to bring plaintiff into disrepute, contempt, ridicule or to constitute an impeachment of his honesty, integrity, virtue or reputation. Ilitzky v. Good-man, 57 Ariz. 216, 112 P.2d 860 (1941); Berg v. Hohenstein, 13 Ariz.App. 583, 479 P.2d 730 (1971), 50 Am.Jur.2d Libel and Slander, § 9. Even though this Court might have reached a contrary decision on this question, we are bound by the Arizona Supreme Court's prior determination. Being bound by that determination, we must examine the prior opinion to determine what the "libel" was that the Arizona Supreme Court found apparent on the face of the editorial. Did the Court find that the editorial libeled plaintiff by calling him a communist? We think not. A fair summary of Justice Lockwood's opinion on this point (concurred in by Justice McFarland) is that the editorial libeled plaintiff by charging him with communist sympathies, charging that he espoused a communist idea involving intimidation, blackmail and terrorism.[2] There is no support in Justice Lockwood's opinion for the position that the Court's ruling finding the editorial libelous per se included a finding that, as a matter of law, it called plaintiff a communist. Justice Struckmeyer in his specially concurring opinion, although using different language, expressed basically the same idea as Justice Lockwood, again furnishing no support for plaintiff's assertion that the libelous per se ruling constituted a determination by the Court that the editorial called plaintiff a communist.[3]

---

1. The Arizona Supreme Court's opinion was not unanimous on this point—two justices dissented.

2. Justice Lockwood states:
 "The insinuation that 'Mr. Church's idea,' embodies and approves of communist methods of intimidation, blackmail and terror, is so apparent here as to leave no room for argument.
 * * * * *
 "The whole thrust of the editorial is to link inseparably Wade Church and the idea of a 'people's council' to the communist 'people's council', thus charging him with espousing a communist doctrine involving intimidation, blackmail and terrorism. This is clearly no less than a charge of being in sympathy with communism in its lawless and violent aspects.
 * * * * *

"It is absurd to assert that under such circumstances the editorial, as claimed by the defendants, merely attacked plaintiff's idea, and therefore was completely lacking in any accusation against plaintiff himself. It was basically a statement that plaintiff's attitude, expressed by his idea, was sympathetic with violent communist methods. 103 Ariz. at 588, 447 P.2d at 846.

3. Justice Struckmeyer states:
 "These statements charge, not as an expression of opinion but as a positive assertion of fact, that Church proposed creating a people's council in Arizona to function just the way the councils that the Communist Party set up under Lenin functioned, they being formed for the purpose of intimidating, blackmailing and terrorizing legislatures and that this is the means of the Communists' seizure of power. It can only be understood to mean that

When defendants' counsel objected during argument to plaintiff's continued assertions in this regard, the trial court ruled as follows:

"The court will instruct the jury the article constitutes a libel per se, and the court will so define it."

In the context in which the ruling was given, it is very difficult to determine whether the trial judge, by the above-quoted ruling, intended to rule that, as a matter of law, the editorial did call plaintiff a communist, or whether he was sustaining defense counsel's objection, thereby indicating that the "libelous per se" ruling did not constitute an instruction to the jury that the editorial called plaintiff a communist. An examination of the court's instructions on libel are equally as confusing on this point.[4] The only factual circumstance specified in the court's instruction as being libelous per se was the imputation to a person that he was *either a communist or a communist sympathizer*. This comment was followed by the court's preemptory instruction that ". . . The court finds as a matter of law, that the defend-

ant's publication is libelous per se." In our opinion the natural conclusion which the jury would draw from the foregoing is that the trial judge did intend that the jury consider that, as a matter of law, the editorial called plaintiff a communist.

This conclusion leads us to a consideration of the question of what difference did all this make? Or, as stated by plaintiff's counsel in his answering brief, "in the context of this case, this [calling plaintiff a communist as opposed to stating that he espoused communist sympathies] was a distinction without a difference." However defendants' counsel argues that in the context of this case such a distinction was all important in view of the New York Times v. Sullivan test for actual malice. As stated by the United States Supreme Court in that decision:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, *with knowledge that it was*

---

Church was advocating the seizure of power through unlawful acts in the same manner as did the Communists, thereby destroying the democratic government of Arizona. The rhetorical question, 'Does he [Church] advocate Communism,' having already been answered by the previous purportedly factual statements, does not ameliorate the serious nature of the charges but serves rather to drive home to the reader the conclusion that Church was indeed advocating Communism.

"That parts of the editorial may be fairly suspectible of another or other interpretations, that is to say, are not libelous per se, does not detract from or exclude the clear charge that Church wished to operate in the same way as the Communists, by intimidation, blackmail and terror." 103 Ariz. at 598, 447 P.2d at 856.

4. The Court's instructions on libel were as follows:

"This present action is commonly known and termed a libel suit. For the purpose of this action, I define libel to you as every publication which tends to bring any person into disrepute, contempt, ridicule or tends to impeach his honesty or integrity, virtue or reputation

as libelous per se. Per se meaning libelous in itself without other proof. I further instruct you that the word tend means to have influence toward producing a certain effect or to exert an influence. *I further instruct you that it would be libelous in itself or libelous per se to impute to a person that he is either a communist or is a communist sympathizer.*

"I instruct you that to render a statement libelous it is not necessary that the charge be made in a direct, positive or open manner. A mere insinuation may be as actionable as a positive assertion, if the meaning is plain. Likewise, the charge or reference may be made by way of asking a question, if the meaning is plain.

"I instruct you that the Court finds, as a matter of law, that the defendants' publication is libelous per se. That is, libelous in itself without proof on the part of plaintiff that said publication is libelous, and you are not to concern yourselves with this issue. All testimony and evidence admitted in this case relates to the remaining issues which are one, truth or falsity; two, actual malice, as will be herein defined, and three, damages." (Emphasis added).

*false* or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. (Emphasis added).

If, as a matter of law, the editorial called plaintiff a communist, and if, as admitted by both defendants Pulliam and Padev in the first trial, neither believed that plaintiff was a communist, then it would conclusively follow that the editorial was published with the "actual malice" required under the Times test. This was the exact argument made by plaintiff's counsel to the jury.[5]

From the foregoing we conclude that plaintiff's counsel's conduct in this regard was erroneous and prejudicial. The question then arises as to whether defendants' counsel, by his repeated failure to object, has waived the right to urge this question on appeal. In reviewing defendants' motion for new trial, we note the following:

"During his closing argument, plaintiff's counsel stated to the jury on several occasions that the Court had ruled, as a matter of law, that the editorial complained of was libelous per se because it called plaintiff a Communist. *Although the Court sustained defendants' objection that such argument was improper, the damage had already been done.*" (Emphasis added).

From the above, two conclusions can be drawn. First, it will be noted that defendants' counsel apparently felt at the time of trial that the trial judge's previously referred to ambiguous ruling did actually sustain his one and only objection. Second, counsel also felt that the damage had already been done by that time. Plaintiff's counsel further points out that defendants did not make any further efforts in this regard to cure any presumed prejudicial effect—counsel did not ask for an admonition by the trial judge to the jury; he did

not ask for a mistrial out of the presence of the jury; nor did he request a curative instruction. The rule usually applicable to appellate review is recognized by both parties and needs no extensive citation of authorities. This rule is stated in City of Prescott v. Sumid, 30 Ariz. 347, 247 P. 122 (1926) as follows:

"That remarks of this nature were highly improper and beyond the legitimate limits of argument cannot be questioned, and appellate courts have frequently reversed cases for just such misconduct. It is nevertheless true that the usual practice requires objection to be made at the time, and that the court be requested to admonish the jury to disregard the improper conduct, or an appellate tribunal will not consider it. *Crumpton v. United States,* 138 U.S. 361, 11 S.Ct. 355, 34 L.Ed. 958 (see, also, Rose's U.S. Notes); *Rush v. French,* 1 Ariz. 99, 25 P. 816; 3 C.J. 862–864.

"The presumption is that an admonition to the jury by the court will remove the effect of the improper remarks. Unless, therefore, it appears that the misconduct was of so serious a nature that no admonition or instructions by the court could undo the damage, a failure to make timely objection is a waiver of error. *Scott. v. Times-Mirror Co.,* 181 Cal. 345, 184 P. 672, 12 A.L.R. 1007; *In re Thomas,* 26 Colo. 110, 56 P. 907.

"Remarks made by counsel in the heat of argument are always taken by reasonable men 'cum grano salis,' and when their impropriety is called to the attention of the jury by the court, it is but rarely that harm results." 30 Ariz. at 355–356, 247 P. at 125.

Notwithstanding the above, defendants contend that the total effect of the several alleged instances of misconduct of plain-

---

5. Plaintiff's counsel argued as follows on the question of malice:
"What is the evidence? The evidence with convincing clarity came out of the defend-

ants' own mouths. *They didn't believe that this man was a communist,* nor did he advocate the violent overthrow of our Legislature or our Government." (Emphasis added).

tiff's counsel were such as to require the trial judge, on his own motion, to step in and take curative action, citing among other decisions, Belfield v. Coop, 8 Ill.2d 293, 134 N.E.2d 249 (1956), wherein the Illinois Supreme Court stated:

"If the argument of counsel is seriously prejudicial, a court should, of its own motion, stop the argument and direct the jury not to consider it. McWilliams v. Sentinel Publishing Co., 339 Ill.App. 83, 89 N.E.2d 266; Rudolph v. City of Chicago, 2 Ill.App.2d 370, 119 N.E.2d 528. If prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved thereon." 8 Ill.2d at 313, 134 N.E.2d at 259.

We have reviewed the entire transcript in this matter, including the arguments of counsel, and do not find sufficient justification to hold that the trial judge should have taken positive action on his own motion in connection with the alleged instances of counsel's misconduct. In this connection we recognize that defense counsel's failure to object in many instances was no doubt dictated by strategic considerations—considerations that, given the posture of this particular case, the nature of the subject matter and the identity of the parties, would, to many experienced practitioners, support the decisions which he made (without benefit of hindsight). However, in the absence of extreme factual circumstances which might justify the application of the principle stated in Belfield, *supra,* an appellate court cannot assume that the transgressions of plaintiff's counsel could not have been effectively cured by prompt trial court action initiated by appropriate efforts of opposing counsel at the trial level.

## QUESTION NO. IV

### ALLEGED ERROR IN LIBEL INSTRUCTIONS GIVEN AT PLAINTIFF'S REQUEST

■ At the request of plaintiff, and over defendants' objections, the court instructed the jury as follows:

PLAINTIFF'S REQUESTED INSTRUCTION NO. 1:

"This present action is commonly known and termed a libel suit. For the purpose of this action, I define libel to you as every publication which tends to bring any person into disrepute, contempt, ridicule or tends to impeach his honesty or integrity, virtue or reputation as libelous per se. Per se meaning libelous in itself without other proof. I further instruct you that the word tend means to have influence toward producing a certain effect or to exert an influence. *I further instruct you that it would be libelous in itself or libelous per se to impute to a person that he is either a communist or is a communist sympathizer.*" (Emphasis added).

PLAINTIFF'S REQUESTED INSTRUCTION NO. 2A:

"I instruct you that to render a statement libelous it is not necessary that the charge be made in a direct, positive or open manner. A mere insinuation may be as actionable as a positive assertion, if the meaning is plain. Likewise, the charge or reference may be made by way of asking a question, if the meaning is plain."

PLAINTIFF'S REQUESTED INSTRUCTION NO. 2B:

"I instruct you that the Court finds, as a matter of law, that the defendants' publication is libelous per se. That is, libelous in itself without proof on the part of plaintiff that said publication is libelous, and you are not to concern yourselves with this issue. * * *"

\* \* \* \* \* \*

PLAINTIFF'S REQUESTED INSTRUCTION NO. 4:

"You are instructed that the defendants' publication is to be construed by you in its ordinary and natural sense. You are to consider the publication in its entirety and to construe the sense of the words which appear in the publication and the ideas adopted in their plain and ordinary meaning as intended to be conveyed to persons of ordinary understanding."

Defendants complain that in view of the court's giving of Instruction 2B finding the publication libelous per se as a matter of law, portions of Instruction No. 1, all of Instruction 2A and all of Instruction 4, while possibly correct as abstract statements of the law, were erroneously given and could only serve to create confusion in the minds of the jury. We agree that the last two sentences of plaintiff's Instruction No. 1 and all of plaintiff's Instruction 2A were erroneously given. By finding the publication libelous per se as a matter of law, the court removed this issue from the jury's consideration and thus there was no reason to give to the jury principles to guide their deliberations in this regard. However, immediately following the giving of plaintiff's Instruction 2B, the court instructed the jury:

"All testimony and evidence admitted in this case relates to the remaining issues which are one, truth or falsity; two, actual malice, as will be herein defined; and three, damages."

Considering these instructions together, we cannot see how there could have been any substantial confusion created in the minds of the members of the jury by these instructions.

■ Turning now to plaintiff's Instruction No. 4, we first note that this instruction did not immediately follow the court's instructions on the libelous per se issue, but rather followed the court's instructions on actual malice. The question of actual malice had been left to the jury under appropriate instructions, and we perceive no error in the giving of plaintiff's Instruction No. 4 when considered in that context.

## QUESTIONS NO. V and VI

### PLAINTIFF'S REQUESTED INSTRUCTION ON MALICE

■ In Question No. V defendants contend that the giving of plaintiff's requested Instruction 2A (quoted *supra*) contravenes Times v. Sullivan, by impliedly permitting the jury to find against the defendants on insinuation or based on asking a question. The argument is made that telling the jury that a mere insinuation may be as actionable as a direct statement and that the charge or reference may be made by a question impinges upon the standards of proof required by Sullivan. To the extent that this argument constitutes an attack upon the trial court's finding that the publication was libelous per se, we can only refer to our previous discussion of the Arizona Supreme Court's decision on the prior appeal and state that we are foreclosed from re-examining this issue. However, the thrust of defendants' argument appears to be related to the "confusion" arguments discussed in Question IV, *supra,* somehow urging that the instruction contravenes the Sullivan "clear and convincing evidence" or "with convincing clarity" tests for the proof of actual malice (discussed *infra*). We confess that we are unable to comprehend defendants' arguments in this regard, and therefore reject them.

Defendants phrased their Question VI as follows:

### "VI

"Whether Plaintiff's Requested Instruction No. 7, given as modified by the Court, which permitted the jury to find the appellants guilty of 'actual malice' from 'a chain of circumstances from which the ultimate fact of actual malice is reasonably and naturally inferable with convincing clarity' constituted re-

versible error as permitting the jury to find 'actual malice' on the part of appellants by (a) a mere preponderance of the evidence, or (b) by an inference reasonably and naturally flowing from a chain of circumstances 'with convincing clarity'."

Plaintiff's Requested Instruction No. 7, as given, reads as follows:

"I instruct you that it is not necessary, and the plaintiff is not required, to prove actual malice on the part of the defendants by direct evidence. He may establish actual malice on the part of the defendants by a chain of circumstances from which the ultimate fact of actual malice is reasonably and naturally inferable with convincing clarity from all of the testimony and evidence introduced in the case."

It will be noted that Instruction No. 7 is essentially a circumstantial evidence instruction.

■ Defendants attack on this instruction appears to be three-fold. First, defendants contend that it contravenes Sullivan in that it allows the jury to "find the fact of actual malice by inference". Defendants make no reference to specific language in Sullivan, nor has this Court found anything in Sullivan which would indicate an intention to modify traditionally accepted rules relating to the type of proof required to show actual malice. In Arizona, even in criminal actions where the burden of proof is beyond a reasonable doubt, any supposed legal distinction between the probative value of direct and circumstantial evidence has been abolished. *See* State v. Harvill, 106 Ariz. 386, 476 P. 2d 841 (1970). The Sullivan test for malice, involving as it does the state of mind of the defendant concerning his knowledge of falsity, would indeed prove difficult to meet if limited to direct proof through admissions or statements made by the defendant. While the Sullivan court does impose a high standard of proof—by clear and convincing evidence—we find nothing to indicate an intention to limit evidence on this issue to that traditionally referred to as "direct evidence".

■ Defendants' second attack upon plaintiff's Instruction No. 7 appears to be based upon a burden of proof argument. Thus counsel states:

"Under this instruction the jury is permitted to find the 'circumstances' from which the malice is to be inferred by any standard of proof acceptable to them or by no standard at all."

Counsel then argues that each fact establishing the chain of circumstances leading to the inference of actual malice must be established by clear and convincing evidence, and that the instruction was therefore defective in only requiring that the ultimate fact of actual malice be inferable with convincing clarity. No citation of authority accompanies defendants' arguments on this point. While we find no decisions directly in point dealing with a "clear and convincing" standard of proof, we do find directly analogous decisions in the criminal law dealing with a "beyond a reasonable doubt" standard. These decisions establish that it is the ultimate issue or particular element of the crime which must be established beyond a reasonable doubt, and not each circumstance or fact introduced into evidence. United States v. Hall, 198 F.2d 726 (2d Cir. 1952); State v. Paris, 43 Wash.2d 498, 261 P.2d 974 (1953); State v. Pack, 106 Kan. 188, 186 P. 742 (1920); 30 Am.Jur.2d, Evidence § 1172.

In our opinion this same principle is equally applicable to cases involving a "clear and convincing" standard of proof. We therefore reject defendants' attack on Instruction No. 7 in this regard.

■ As a final challenge to Instruction No. 7, defendants in their reply brief assert that there was no basis in the evidence for circumstantial evidence instruction on actual malice. We will not consider this argument in detail, inasmuch as the objection in the trial court was not made on this basis. Rule 51(a), Rules of Civil Procedure,

16 A.R.S.; Winchester v. Palko, 18 Ariz. App. 534, 504 P.2d 65 (1973); Brooker v. Canny, 103 Ariz. 529, 446 P.2d 929 (1968).

We will say, however, that in our opinion there was circumstantial evidence bearing upon the issue of actual malice.

## QUESTION NO. X
### THE TRIAL COURT'S DUTY RE DEFENDANTS' DIRECTED VERDICT MOTIONS

 Through their Question X, the defendants contend that the Times v. Sullivan clear and convincing standard of proof for actual malice requires that on a motion for directed verdict, the trial judge must make an independent determination as to whether there has been a showing of actual malice, and that in making such a determination he must weigh the evidence, draw such inferences as he deems justified, and make his own determinations comparing the credibility of witnesses. This would be clearly contrary to the normal duty of the trial judge under well-established principles in Arizona law holding that on a motion for directed verdict the trial judge must view the evidence in a light most favorable to the opposing party, accepting the truth of whatever evidence he has introduced, together with all reasonable inferences to be drawn therefrom. Davis v. Weber, 93 Ariz. 312, 380 P.2d 608 (1963); City of Phoenix v. Brown, 88 Ariz. 60, 352 P.2d 754 (1960); Joseph v. Tibsherany, 88 Ariz. 205, 354 P.2d 254 (1960).

There is some support for defendants' contentions. *See* concurring opinion of Judge J. Skelly Wright in Wasserman v. Time, Inc., 138 U.S.App.D.C. 7, 424 F.2d 920 (1970). However, in our opinion, the correct analysis of the Times v. Sullivan requirements in this regard is set forth in Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael, 492 F.2d 438 (9th Cir.

1974). There the court considered the same argument being presented here, and held:

"We think that in a libel case, as in other cases, the party against whom a motion for summary judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, or course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal had the authority to weigh credibility or to choose among legitimate inferences in such cases.

"The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury, and it is error to grant a directed verdict, as the trial judge did in this case." 492 F.2d at 441. (Emphasis in original).

We therefore reject the contentions advanced by defendants on this issue.

## QUESTIONS XI through XIV
### LAW OF THE CASE AND SUFFICIENCY OF EVIDENCE RE "KNOWING FALSITY"[6]

In Questions XI through XIV defendants question the applicability of the law of the case doctrine on this appeal, insofar as

6. In this opinion the use of the term "knowing falsity" or "knowledge of falsity" is intended to encompass the complete test of actual malice set forth in Times v. Sullivan and previously quoted in this opinion.

concerns proof of falsity and defendants' knowledge of such falsity. In the Arizona Supreme Court's opinion on the first appeal, there is specific language indicating a belief by that Court that the evidence in the first trial would have been sufficient to support a jury finding of knowing falsity, had the jury been properly instructed under the Times v. Sullivan test. Defendants contend that while the evidence presented at the first trial relating to this issue was substantially repeated in the second trial, there was also introduced new and important additional evidence which negated or made inappropriate the Arizona Supreme Court's prior findings.

Before proceeding further, it must be stated that when a libel is not directly stated, but rather depends upon inferences to be drawn by the reader, as in this case, it becomes difficult to apply the Times v. Sullivan test with any degree of precision. The difficulty is encountered because all of the facts directly stated in the allegedly libelous publication might well be true. Specifically as to this case, defendants have well summarized the issue as follows:

"Since it was not disputed that Church [plaintiff] did recommend that labor sponsor 'people's councils' for the purpose stated and since it was not disputed that in fact 'people's councils' had been utilized as an infiltration device both in Europe and the United States, the impropriety charged to [defendants] must be that they claimed he was advocating a people's council of the communist kind when they knew he didn't intend that kind of organization."

In defendants' view, the only evidence presented which could arguably justify a submission to the jury of this issue was the admission by defendant Padev, and the claimed admission by defendant Pulliam, that they did not believe that the plaintiff was a communist or a communist sympathizer. We do not agree that the evidence on this issue was quite so limited. The jury had before it the newspaper account

of the plaintiff's speech which formed the basis for the writing of the editorial. There was extensive testimony concerning Padev's direct experience with, and study of, communist methods and ideology. In our opinion the jury was entitled to consider this evidence in arriving at a determination of whether the defendants necessarily knew that the plaintiff, in his Flagstaff speech, was not advocating a people's council of the kind and having the purpose defendant Padev described in the editorial. The Arizona Supreme Court in its prior opinion took the same view. Thus, Justice Lockwood stated:

"To the extent that Padev was qualified to testify as to communist theory, institutions, and devices, the factual basis of the statements of the editorial regarding those subjects may be accepted. Yet this could not necessarily overcome the knowledge of falsity of the statements of fact as applied to what the plaintiff proposed in his speech, *as shown by the reportorial accounts immediately following it, and which both defendants Padev and Pulliam testified they had read before the editorial was published.*" (Emphasis added). 103 Ariz. at 595, 447 P.2d at 853.

And in Justice Struckmeyer's specially concurring opinion:

"The author of the editorial, Michael Padev, gained his information about Church's speech from a newspaper report, which is deserving of being requoted in part since, I believe, it is determinative of the question.

\* \* \* \* \* \*

"The newspaper account points out that what Wade Church meant by his use of the phrase 'people's council' was to 'hire full-time personnel to match lobbyists' with other interests. In representative government, lobbying is a lawful and accepted procedure for communicating the wishes of the electorate to the membership of legislatures. *No stretch of the imagination can equate this demo-*

*cratic process with the Communist technique for the seizure of power through intimidation, blackmail and terror. The editorial is not only false but the jury could have concluded that Padev must have known it was false."* (Emphasis added). 103 Ariz. at 598–599, 447 P.2d at 857.

It is true that on the re-trial new testimony was given relating to the function and practice of editorial writers who write commentary columns on political figures and public events. This evidence came from defendants Padev and Pulliam, and witness Ralph de Toledano. Defendants summarize this testimony as follows:

"All three witnesses testified unequivocally that a news commentator and editorial writer does not as a matter of course (and necessity) consider whether or not a political figure who makes a public proposal in fact actually believes in and personally supports the proposal made. The proposal may be a 'trial balloon;' it may be a spur of the moment thought; or it may be that the speaker simply got carried away by his own enthusiasm.

"Once the proposal is publicly made the function of the commentator or editorial writer is to attack it—commend it —ridicule it—or otherwise deal with it."

From the foregoing, defendants argue that if defendant Padev, in writing the editorial in question, as a professional news analyst and commentator routinely accepted the proposal as made by plaintiff Church as a "trial balloon" or as a thoughtless, spur-of-the-moment thing, or even as a rabble-rousing challenge to the "establishment" sort of thing, and proceeded to subject it to a better, caustic and devastating barrage of criticism, he was justified in so doing under the now firmly established principles of the law of libel in the area of free press, free speech within which the publication was made.

■ We agree with the defendant's basic premise that an editorial writer is not

required to consider whether a political figure actually believes in and supports proposals which he might publicly make. However, in advancing their arguments, defendants ignore the fundamental issue in this case concerning the public proposal which was actually made by plaintiff, that is, did plaintiff, in his Flagstaff speech, advocate a people's council of the kind and having the purpose defendant Padev described in his editorial? If plaintiff's words were reasonably susceptible to the interpretation that plaintiff advocated a communist-type people's council, then plaintiff's personal undisclosed beliefs and defendants' knowledge or lack of knowledge of those ebeliefs, would be immaterial in any libel action which plaintiff might file. Such reasoning is not applicable, however, where, as in this case, the fundamental basis of the plaintiff's complaint is that the defendants' editorial completely and falsely misrepresented the nature of the proposal actually stated by plaintiff.

■ In our opinion the evidence on the retrial was sufficient to justify the submission of the knowing falsity issue to the jury under the standards promulgated by Times v. Sullivan. Therefore we need not consider whether the law of the case doctrine in and of itself, would have required that this issue be submitted to the jury on the retrial.

## QUESTIONS VII, VIII and IX

### PLAINTIFF'S REQUESTED INSTRUCTION CONCERNING THE LIABILITY OF *ALL* DEFENDANTS

Plaintiff's Requested Instruction No. 19 was given by the trial court and reads as follows:

"You are further instructed that a corporation can only act through its agents, employees and officers. And in connection, I instruct you if you bring in a verdict in favor or the plaintiff, it must be against all defendants."

Defendants complain about that portion of the instruction which required the jury

to find against *all* defendants if it found its verdict against any defendant. Defendants contend that under the Times v. Sullivan "actual malice" test, the jury could well have found that one or more of the defendants did not have the requisite knowledge of falsity, and therefore would not have been liable, notwithstanding possible liability on the part of other defendants. We will discuss this contention as to each defendant separately.

As to the defendant corporation, it is contended that the doctrine of *respondeat superior* is "inapplicable as being overridden by the requirement of proof of actual malice." While this contention is somewhat broadly stated, we do not understand defendants' contention to be that under no circumstances can a corporate defendant employer be held liable for libel under the Times v. Sullivan test. Rather, the argument appears to be that defendant Pulliam had the ultimate authority to approve or disapprove the publishing of the editorial, and that in fact it was he who authorized its publication and it was upon his responsibility that it was published. It is then argued that if defendant Pulliam was free of actual malice then the defendant corporation, Phoenix Newspapers, Inc., could not be said to have been actuated by actual malice notwithstanding any malice which the trial court might find on the part of defendant Padev. In support of this position defendants cite the following language from Times v. Sullivan:

> "Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times 'knew' the advertisement was false, *since the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement.*" 376 U.S. at 287, 848 S.Ct. at 730 (Emphasis added).

We do not find the same meaning in this language from Times v. Sullivan as is apparently discerned by defendants. In the facts in Times there was no employee having any responsibility in connection with the acceptance or publication of the allegedly libelous advertisement who knew the advertisement was false. Here both Padev and Pulliam were directly involved in the activities leading to the publication of the editorial, and as we have previously indicated in our opinion the evidence was sufficient to submit to the jury the issue of whether one or both of them had knowledge of its falsity. We find nothing in Times v. Sullivan or its progeny which would purport to change in any way well-settled principles of agency law making the employer liable for defamatory statements made by an employee acting within the scope of his employment. *See* Restatement of Agency Second, § 247.

Under the facts of this case no sound argument can be made that defendant Padev's activities concerning the writing and publishing of the editorial were not within the scope of his employment with the defendant corporation. We therefore hold that actual malice on the part of either Pulliam or Padev would be imputed to the corporation as their employer. It follows that as to the defendant Phoenix Newspapers, no error was committed by the giving of Instruction No. 19 since the jury could not find against either Pulliam or Padev without being required to find against their employer, Phoenix Newspapers, Inc.

We next consider the propriety of Instruction No. 19 insofar as concerns defendant Pulliam. He was the president of the defendant corporation which owned the newspaper, and, as previously stated, exercised overall control of its editorial policies. Defendant Padev, while subject to the overall control and authority of defendant Pulliam, was an employee of the defendant corporation. Although not cited by plaintiffs, we do find some authority which would support a holding that under

these circumstances a defendant in Pulliam's position could be held equally liable with the owner, defendant Phoenix Newspapers, Inc., for the publication therein of a libelous editorial, even in the absence of evidence of personal participation. See authorities cited, 50 Am.Jur.2d, Libel and Slander, §§ 335, 336. We question the legal soundness of these decisions. *See* Folwell v. Miller, 145 F. 495 (2d Cir. 1906); Knoxville Pub. Co. v. Taylor, 31 Tenn. App. 368, 215 S.W.2d 27 (1948). However, regardless of any prior validity which such a concept might have had, it is our opinion that it cannot survive the impact of the "actual malice" principles enunciated in Times v. Sullivan. We therefore start with the premise that under Times v. Sullivan, apart from the application of the doctrine of *respondeat superior,* an individual defendant cannot be held liable unless the jury finds that the individual himself has been actuated by actual malice (knowledge of falsity). Applying this principle to the case at hand, before defendant Pulliam could be held liable, the jury was required to find that he, himself, was actuated by actual malice (knowing falsity) when he participated with Padev in the activities culminating in the publication of the editorial. Plaintiff has presented no theory nor has he cited any authority under which any malice found on Padev's part could be imputed to the defendant Pulliam. The evidence on knowledge of falsity was not such that it was inherently applicable equally to both individual defendants on this issue, thereby requiring a finding that either both had knowledge of falsity or that neither had knowledge of falsity. Under the evidence the jury could well have found that defendant Padev had, and defendant Pulliam did not have, such knowledge.

Without going into a detailed review, there was evidence that Padev had written the editorial on his own initiative prior to any conversation with Pulliam, and that Pulliam authorized the publication of the editorial with a much more limited knowledge of its actual contents than that possessed by Padev; that Padev was the foreign affairs editor of the newspaper and a recognized expert on communism; that because of Padev's expertise, Pulliam had complete confidence in his analysis and views concerning the people's council idea espoused by plaintiff. Further, the evidence in this trial as to Pulliam's knowledge and belief as to whether plaintiff was a communist was much weaker than that of Padev. Based upon this evidence, the jury might well have found that Pulliam did not have actual malice—that is, knowledge that the people's council proposal espoused by plaintiff was not similar or comparable to the people's council idea advocated by communists.

We therefore hold that the giving of Instruction No. 19 constituted reversible error as to defendant Pulliam.

■ We turn now to the question of whether the giving of Instruction No. 19 constituted reversible error as to the defendant Padev. From what we have previously stated in this opinion, it is obvious that a stronger case of actual malice (knowing falsity) was presented against Padev than was presented against Pulliam. Padev was the initiator and the writer of the editorial. He was the expert on communism. It was based upon his representations concerning people's councils that Pulliam authorized the publication of the editorial. Although the giving of the instruction may have constituted technical error as to Padev, it is difficult to see any prejudice to Padev from an instruction which in essence prohibited a verdict against him, unless a verdict was also returned against Pulliam, against whom a weaker case had been presented.

Counsel argues that the principal prejudice against defendant Padev arises from the fact that Instruction No. 19 requires a finding of liability on his part if liability is found on the part of two "target" defendants, that is, defendant Pulliam and defendant Phoenix Newspapers, Inc. As we have previously stated, any actual malice

found on defendant Padev's part would be imputed to defendant Phoenix Newspapers, Inc., thereby automatically requiring a verdict against Phoenix Newspapers under such circumstances. Therefore, Instruction No. 19 was not erroneous insofar as it concerns the linking of defendants Padev and Phoenix Newspapers, Inc. for liability purposes.

As to defendant Pulliam's status as a "target" defendant, we find nothing in the record to support this contention.

The judgment of the trial court is affirmed as to defendants Padev and Phoenix Newspapers, Inc., and reversed as to defendant Pulliam.

JACOBSON, P. J., and OGG, J., concurring.