770 P.2d 359

Stephen M. MORRIS, Plaintiff/Appellee,

v.

Ronald H. WARNER, Defendant/Appellant.

No. 2 CA–CV 88–0197.

Court of Appeals of Arizona, Division 2, Department B.

Nov. 17, 1988.

As Corrected Dec. 5, 1988 and Jan. 6, 1989.

Review Denied March 28, 1989.*

* Gordon, C.J., and Feldman, V.C.J., of the Supreme Court, recused themselves and did not participate in the determination of this matter.

Marton & Hall, P.A. by Kraig J. Marton, Phoenix, for plaintiff/appellee.

Winston & Strawn by Arthur P. Greenfield and Daniel D. Maynard, Phoenix, for defendant/appellant.

## OPINION

ROLL, Presiding Judge.

Defendant/appellant Ronald H. Warner appeals from a jury verdict awarding $1,000,000 in damages against him and in favor of plaintiff/appellee Stephen M. Morris for defamation. For the reasons set forth below, we reverse.

## FACTS

The context from which this litigation arose involves interaction among former members of the board of directors of Sam-Cor Inc., which was established in 1982 as a not-for-profit health care holding compa-ny to oversee subsidiaries Samaritan Health Services (SHS), Samaritan Medical Foundation and DynaCor, Inc. SHS owned four not-for-profit hospitals in the Phoenix metropolitan area. Warner was chairman of the board of directors of the predecessor of SamCor from 1979 to 1982, and he continued to be a member of the board of directors following the reorganization. Morris served as chief executive officer and chairman of the board of SamCor from 1982 to 1984. In 1984, the SamCor board of directors was comprised of 18 members.

In 1984, SamCor officials concluded that options for the corporation needed to be explored based upon the "changing health care environment."[1] During April of 1984, the Strategic Options Task Force (SOTF) was created as a subcommittee of Sam-Cor's planning committee to review Sam-Cor's options, including the sale of SHS assets to a for-profit entity. Both Morris and Warner were members of SOTF.[2]

Despite the existence of SOTF, Morris also formed an ad hoc committee in April of 1984 comprised of six of the members of the SamCor board of directors and one Samcor staff member.[3] Its sole purpose was to investigate the sale of SHS. The ad hoc committee was not a subcommittee of SOTF or of SamCor's planning committee. A majority of SamCor's directors were not a part of this group, and Warner was among those excluded. The record indicates that the ad hoc committee and its activities were either entirely or largely unknown to the excluded members of the board of directors until the middle of June 1984.

At the April 26, 1984, SamCor board of directors meeting, a spirited discussion ensued regarding the lease of a corporate jet by DynaCor. Warner and other board members claimed that the jet had been

1. At that time, rising health-care costs were the subject of legislative proposals and a constitutional initiative was supported by the Coalition for Cost Effective Quality Health Care.

2. Other SamCor board members appointed to SOTF were William Hicks and Lou Jolly. Sam-Cor staff members appointed to SOTF were Rhonda Bickart and Clarence Teng.

3. The members of the ad hoc committee who were also members of the SamCor board of directors were Morris, Alice Snell, Harry Cavanagh, Hicks, Dan Dearen, and David Reed. Teng was also a member of the ad hoc committee.

acquired without board authorization. Morris stated that the report of DynaCor approved by SamCor board members at its November 17, 1983, meeting referred to acquisition of the corporate jet. The minutes of the November 17 meeting reflect that Dan Dearen presented the DynaCor report. During this multi-faceted report, Dearen stated:

> Valley Acceptance has been authorized, on a guaranteed buy back basis, to lease a Lear Jet and a Hawker–Sidley 700. One of these aircraft would be leased to a joint venture with Southwest Forest and the SamCor network.

The November 17 minutes further reflect that the DynaCor report was approved as presented. Despite the November 17 minutes, the minutes of the April 26, 1984, board meeting contain the following notations:

> Members also expressed lack of knowledge about the plane and said they did not recall board discussion or authorization for the lease. Mr. Morris and Mr. Dearden remarked that the DynaCor board had an extended discussion which was reported to this board in November, 1983.
>
> \* \* \* \* \* \*
>
> VOTED: Upon motion duly made, seconded and carried, the board directed that Valley Acceptance Corporation be requested to either negotiate a substitute for SamCor's lessee rights or sell the Hawker–Sidley aircraft presently leased from Valley Acceptance Corporation free of lease obligations at an economically acceptable figure.

A taped recording was made of the April 26 meeting and a transcript was prepared. The transcript reflects that Warner made a motion "that SamCor's relationship to this aircraft be terminated in the most expedient manner possible that would let Dyna-Cor make the necessary financial recovery in the best interest of the corporation." In further elaborating upon his motion, insofar as is relevant to this litigation, Warner stated:

> I think what I am saying, Jim, is two things:

> (1) SamCor will not make any corporate use of the jet, the way we are flying around in a corporate jet that relationship to the jet will be terminated today . . . .

Although Warner's motion carried, the above-quoted statement was not memorialized in the revised minutes of the meeting.

During April of 1984, the ad hoc committee retained Strategic Management Services to render consulting services concerning the possible sale of SHS. Ultimately, Strategic Management Services was paid $89,061 for services rendered. On May 2, 1984, the ad hoc committee retained the law firm of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears to render legal services regarding the proposed sale of SHS. This law firm was ultimately paid $92,000 for services performed. In May of 1984, the ad hoc committee also retained the accounting firm of Ernst & Whinney regarding the possible sale of SHS. This firm later billed SamCor for $56,000 in services. Around May 6, 1984, Dean Witter Reynolds (DWR) was retained as a financial consultant by the ad hoc committee.

In addition to retaining specialists to assist it, the ad hoc committee took other actions, including meetings with three potential purchasers of SHS. Specifically, between May 14–16, 1984, the ad hoc committee and/or its representatives met with representatives of Hospital Corporation of America (HCA) in Nashville, Health Resources Corporation of America (HRCA) in Houston, and American Medical International (AMI) in Los Angeles. Members of the ad hoc committee were transported to these meetings aboard the previously discussed corporate jet.

On May 29, 1984, the ad hoc committee met with DWR to prepare requests for proposals (RFPs) from the three prospective purchasers. That same day, SOTF held its first meeting. Both Morris and Warner were in attendance. At that time, SOTF authorized staff to explore the possibility of selling SHS to a for-profit organization:

> It was moved, seconded and carried to authorize staff to explore a for-profit

option for SamCor and report back to the Strategic Options Task Force with specific figures detailing the financial difference between SamCor as for-profit and as a not-for-profit system, and the impact on community services.

No mention was made that members of the ad hoc committee had already met with three prospective for-profit purchasers.

On June 1, 1984, Morris caused RFPs to be mailed to HCA, HRCA, and AMI. The cover letter sent to the three companies and signed by Morris stated in part:

I am writing to ask your firm formally to consider entering into a healthcare partnership with the people of metropolitan Phoenix and the State of Arizona through the purchase, lease or other affiliation involving substantially all of the assets of SHS....

In general, such a lease or sale would place you in possession of substantially all of the real property, equipment, contract rights and liabilities, good will, corporate franchises and other assets and properties of SHS....

I would hope that in responding to this letter, you could separately set forth the consideration which you would offer to pay pursuant to a sale or under a lease....

I look forward to the receipt of your proposal and offer by Tuesday, June 12....

In order to facilitate your response, members of the Project Task Force and I will be at the Park Suite Hotel in Denver on June 6 from 2:00 pm to 4:30 pm to discuss this with you and your staff ...

That same day, Warner and two other board members who were not part of the ad hoc committee asked Morris about rumors concerning the sale of SHS. Morris replied that DWR had been retained to do an asset valuation and contact had been made with a Houston for-profit organization. No other details were given by Morris. Although conflicting evidence was presented, Warner testified that during this meeting he acted as spokesperson for other board members in asking Morris to consider resigning as chairman of the board.

On June 6–7, 1984, some members of the ad hoc committee traveled to Denver aboard the corporate jet to meet with representatives of HCA, HRCA, and AMI. All three prospective purchasers sent high ranking representatives to the meeting, including HCA's chief executive officer and HRCA's chairman of the board and chief executive officer.

On June 11–12, 1984, the three companies submitted to Morris their respective proposals for the purchase of SHS. HCA submitted a proposal of $493,000,000, HRCA proposed to purchase SHS for $393,000,000 in cash or $450,000,000 in cash and notes, and AMI proposed $380,800,000. AMI's acquisition proposal contained the following statement:

With regard to Mr. Morris, we hope to retain his services as a consultant in order to ensure the success of the hospital system, retain continuity of management, and demonstrate the reasons contributing to the success of this unique venture between a major tax-exempt multi-hospital system and an investor-owned chain.

On June 13, 1984, DWR reported to the ad hoc committee that SHS's assets had a value of between $334,000,000 and $497,000,000. That same day, both Morris and Warner attended a meeting of SOTF. During the meeting, a motion was adopted to obtain an independent valuation of SHS assets. Morris again made no mention of the ad hoc committee's visits to the three prospective purchasers, the mailing of RFPs, the meetings conducted with the three companies in Denver, the responses of the three companies to the RFPs, or the results of the independent valuation already conducted by DWR.

A SamCor board of directors meeting was held on June 20, 1984. At the meeting, once again no reference was made to the activities of the ad hoc committee, although the possible sale of SHS was discussed. The day after the board meeting, the ad hoc committee again met with representatives of HCA, HRCA, and AMI in

**60**

Denver. That same day, Warner met with a representative of the news media and discussed Morris and SamCor.

On June 21–23, representatives of HCA, HRCA, and AMI attended "special" meetings with an employee of DWR who acted as a representative of the ad hoc committee. Each of the special meetings focused upon the benefits the prospective purchasers of SHS would bestow on Morris and others if they were successful in purchasing SHS.

The AMI minutes reflect that the situations of SamCor staff member Clarence Teng and SamCor board member Dan Dearen were not discussed because both of these individuals enjoyed other options in the event that AMI succeeded in acquiring SHS. Mel Cunningham, a SamCor employee, and Reed were to be offered a ten-year commitment. The minutes of the June 21, 1984, meeting with AMI state, in part:

*Lastly, we discussed the projected situation as it applies to Steve Morris. First, we reviewed the role they anticipate him taking with AMI. Our interpretation was that he would be used to serve as a "special advisor" to top AMI management and the Board relative to relations with the "non profit" sector as well as taking an active role in assisting AMI in meeting its development goals. He would have no operational responsibilities relative to the Phoenix operation of AMI. He would not be a member of the AMI Board as the thrust of the Company is away from having 1) management or employees at the Board level or 2) having people with a purely health care background on their Board.*

\* \* \* \* \* \*

*As to compensation and related benefit levels, AMI stated he would be afforded the same considerations as Messrs. Reed and Cunningham. He would be given a ten year contractual commitment. In response to a question regarding the type and availability of stock option or other incentive programs potentially available, it was stated he would be afforded incentives on the same basis*

*as other members of top management.* (Emphasis added.)

The June 22, 1984, HRCA special meeting minutes state that if HRCA succeeded in acquiring SHS, Cunningham would receive a contract through his retirement date, Dearen would be offered a five- to seven-year contract and would continue as chief executive officer of DynaCor, and Reed would also receive a five- to seven-year contract. It was agreed that Teng's situation need not be discussed since he "would go to the proposed Foundation." Finally, the minutes described HRCA's plans for Morris:

*Finally, we were able to spend some time talking about Steve Morris. We hit first on what they anticipated his role would be. Dr. Pesch stated that he expected Mr. Morris to be heavily involved in their development efforts with little involvement in Arizona except for transitional duties. He would also serve on the Board of Directors of HRCA. We stressed the importance of Mr. Morris not desiring any operational role in Arizona more than absolutely necessary and they concurred with this approach. We also discussed Mr. Morris's desire to keep his future exposure to a minimum relative to Arizona operations and, therefore, suggested that his operation take a low profile in all areas even to the level of office space and related support. They agreed with this approach.*

*We then spent some time on compensation and tenure with the suggestion to HRCA that they give Mr. Morris a ten year contract with a continued compensation and fringe benefit package equal to his current situation. His compensation would then be subject to modification in the future based on performance under the executive personnel policies utilized by HRCA. They agreed to the above and additionally offered the prospect of stock options and/or other incentive programs that he could become eligible for based on performance in line with established Company policy.* (Emphasis added.)

The "special meeting" with HCA took place on June 23, 1984. During this meeting, as with the meetings with the other two prospective purchasers, the futures of Teng, Dearen, Cunningham, and Reed were discussed. Once again, Morris's future prospects should HCA succeed in acquiring SHS were discussed:

*Lastly, we discussed Mr. Morris's situation.* They commented that, in their opinion, he was one of the most innovative, successful and respected executives the health care field has seen. They felt they would be able to use his talent and reputation primarily in their development program to great success. He would report directly to Mr. Frist and, although no title had been selected at this time, *he would probably come in as an HCA executive officer at a level equal to Messrs. Brooks, Hutts and Martin.* We stated that Mr. Morris wished to have no local operation responsibilities and they stated they agreed with this. Further, although he would be domiciled in Arizona, he would have absolutely no authority in Arizona. We suggested that he be provided office space and support away from any divisional headquarters or operating facility and they agreed this was an excellent idea.

*As to compensation and tenure they stated he would be offered a ten year contract. They then agreed to bring him in at his current level and match*

*his current fringe benefit package.* Further, they stated that he would be reviewed annually as all senior company executives are and would receive any adjustments in line with corporate policy. Finally, they stated he would be offered the opportunity to participate in their stock option program (as described before) at a level equal to his peers. (Emphasis added.)

On June 22, 1984, Warner received a telegram notifying him of unscheduled board meetings on June 27 and June 28, 1984. Warner assumed that these meetings were called to "push through" the sale of SHS. Again, Warner spoke to the news media. On June 25, 1984, Warner spoke with the chairman of the board of HRCA and was told that HRCA was prepared to purchase SHS subject only to an asset valuation. That same day, Morris announced his resignation as SamCor's chief executive officer and chairman of the board. Morris alleges that Warner intermittently made additional statements, oftentimes redundant, until July 25, 1984.

## PROCEDURAL BACKGROUND

On August 7, 1984, Morris filed a complaint against Warner and others, alleging defamation. An amended complaint was filed thereafter which alleged thirty separate instances of defamation.[4] Morris

---

**4.** The allegedly defamatory statements set out in Morris's complaint are as follows:

THE DEFAMATIONS

7. On or about June 21, 1984 Mr. Warner....

8. ... made the following statements which were of and concerning the Plaintiff:

a. that Mr. Morris had "put together" a sale of the Samaritan Hospital Network;

b. that several SamCor board members asked Morris to resign as chairman of the board of SamCor during the week prior to June 22nd; and that Morris "refused to step down";

c. that Morris made "major decisions without board authority";

d. that Morris purchased a 3.5 million dollar jet without board authority;

e. that Morris "was rewriting corporate by-laws without board approval";

f. that Morris "was planning to dispose of" Samaritan Health Service without board approval;

g. that Morris "has been negotiating secretly for weeks" to sell the Samaritan Hospital network;

h. that Morris had kept the Samcor Board "in the dark about the negotiations";

i. that Morris had not consulted with the SamCor Board "in an attempt to develop a corporate strategy for dealing with demands by businessmen and legislators for hospital cost controls;"

j. that "work was underway on a possible sale without the board's knowledge" and that Mr. Warner was "incredulous" about that;

k. that the first time any possible sale "was brought to the board's attention" was at a meeting on June 20, 1984;

l. that the possibility of a sale "has never been brought to the attention of the executive committee;"

\* \* \* \* \* \*

11. On or about June 22, 1984 Mr. Warner stated ...:

sought $5,000,000 in general damages and $5,000,000 in punitive damages.

Only the allegations against Warner proceeded to trial.[5] During the two and one-half month trial, 43 witnesses testified, 716 exhibits were marked for identification, and 5,210 pages of testimony was transcribed. The jury returned a verdict of $1,000,000 in favor of Morris.

## ISSUE ON APPEAL

The sole issue on appeal is whether sufficient evidence exists to sustain the jury's verdict.

## DISCUSSION

 In order to recover damages for defamation, Morris was required to prove that (1) Warner made a false statement concerning Morris, (2) the statement was defamatory, (3) the statement was published to a third party, (4) Warner made the statement with actual malice, and (5) Morris was damaged as a result of the statement. Morris was required to prove all of the elements except actual malice by a preponderance of the evidence. *Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485, 511, n. 30, 104 S.Ct. 1949, 1965, n. 30, 80 L.Ed.2d 502, 524, n. 30 (1984); *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 596–97, 447 P.2d 840, 854–55 (1968). Except as to the element of actual malice, our standard of review is limited to whether substantial evidence exists to support the jury's verdict.

a. that Morris "has negotiated to sell Sam-Cor and all of its subsidiary companies to one of two private health care corporations;"

b. that the SamCor board of directors "probably is powerless to stop the sale because of revisions to the articles of incorporation and by-laws which were pushed through by Morris two years ago;" and

c. that Morris amended the by-laws of SamCor two years ago and thereby took control of SamCor.

12. On or about June 25, 1984 Mr. Warner ... [stated]:

a. that Morris had "assured the rest of the board that no formal negotiations to sell the hospital chain had been conducted" even though "formal negotiations were held with at least two 'investor-owned' hospital companies out of state;"

b. that "On June 1, Morris asked Health Resources to submit a formal bid to buy the hospitals;"

c. that Morris had engaged in a "very serious cover-up;"

d. that Morris had engaged in "clandestine negotiations";

e. that Morris had "compromised" himself; and

f. that Morris "assured us that selling was only an option and that [he] wanted permission from the board to begin talking with prospective buyers when, in fact, [he] already had (talked to them) and [he] vehemently denied that to [the board]."

13. On or about June 25, 1984 Mr. Warner ... [stated]:

a. that Morris had been "secretly negotiating" to sell Samaritan Health Service to one of three investor-owned companies;

b. that "Mr. Morris will be a consultant (for Hospital Corporation of America) but that he will not be assigned to work in Arizona" upon the sale of the Samaritan Hospital chain to Hospital Corporation of America; and

c. that Mr. Morris' "credibility has gone close to zero."

14. On or about June 26, 1984 Mr. Warner ... [stated] ... that "'back to back' meetings had been set up by Morris to facilitate the sale of SamCor to one of three investor owned hospital chains."

15. On or about June 27, 1984 Mr. Warner ... [stated]:

a. that Morris had used the corporate jet in violation of a board resolution prohibiting the jet's use and ordering it sold; and

b. that the board had passed a resolution on April 26, 1984 that "there would be no corporate use of the jet from April 26th onward."

\* \* \* \* \* \*

19. ... Mr. Warner presented a written *statement to the board of directors of SamCor on or about Wednesday, July 25, 1984; a true copy of that statement is attached hereto as Exhibit "A" and incorporated by reference.*

20. In that statement, Mr. Warner has accused Plaintiff:

a. *of telling the President of Health Resources Corporation of America and others that Samaritan Health Service Hospitals were ready to be sold "subject only to an asset audit;"*

b. that Plaintiff engaged in "unauthorized Board operations"; and

c. that Plaintiff had lied about what was going on at two sub-committees and two board meetings by leading the board and sub-committees "to believe none of this was going on."

5. Summary judgment was entered in favor of co-defendant Carolyn Warner on October 22, 1986.

*Whittemore v. Amator,* 148 Ariz. 173, 175, 713 P.2d 1231, 1233 (1988); *Phoenix Newspapers, Inc. v. Church,* 24 Ariz.App. 287, 293, 537 P.2d 1345, 1351 (1975). Substantial truth is a complete defense to an action for defamation. *Fendler v. Phoenix Newspapers, Inc.,* 130 Ariz. 475, 479, 636 P.2d 1257, 1261 (1981).

■ Morris was required to prove actual malice because the parties stipulated that Morris was a public figure. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). A statement is made with actual malice when the declarant makes the statement with knowledge that it was false or with reckless disregard for the truth. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). Actual malice must be established by clear and convincing evidence. *Bose Corp, supra,* 466 U.S. at 511, 104 S.Ct. at 1965, 80 L.Ed. 2d at 524; *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed. 2d 789, 807 (1974); *Scottsdale Publishing, Inc. v. Superior Court,* 159 Ariz. 72, 82, 764 P.2d 1131, 1141 (Ct.App.1988). Our standard of review regarding proof of actual malice is an independent examination of the record to determine whether clear and convincing evidence of actual malice was present. *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 486, 724 P.2d 562, 572 (1986).

The jury in this matter returned a general verdict in favor of Morris. The thirty allegedly defamatory statements fall within five broad categories: (1) negotiations, (2) lease and use of aircraft, (3) bylaws, (4) resignation, and (5) miscellaneous.

The allegedly defamatory statements made by Warner occurred between June 21 and July 25, 1984. Many of Warner's earlier statements were repeated on later occasions. Morris argues that Warner cannot utilize the various activities of the ad hoc committee to justify statements which Warner made before the activities were known to him. We do not agree. Some of the statements made by Warner on July 25, 1984 were identical to those made around June 21, 1984. Under Morris's suggested analysis, certain statements made by Warner in June of 1984, were made with actual malice but, when repeated by Warner one month later, they were made without actual malice because of new information learned by Warner in the interim. This argument disregards the most important legal premise in defamation actions: truth is a defense.

### 1. Negotiations

Allegedly defamatory statements by Warner regarding negotiations included statements by Warner that Morris had (1) put together a sale, (2) made decisions without board approval, (3) planned to dispose of SHS without board approval, (4) conducted secret negotiations, (5) kept the board "in the dark," (6) hadn't consulted the board, (7) worked on a possible sale without the board's knowledge, (8) didn't tell the board of the possible sale until June 20, 1984, (9) didn't bring to the attention of the executive board the possible sale of SHS, (10) negotiated to sell to one of two private health care providers, (11) conducted formal negotiations to sell the hospital chain despite contrary assurances to the rest of the board, (12) asked HRCA to submit a bid, (13) engaged in a very serious cover-up, (14) engaged in clandestine negotiations, (15) asked for permission from the board to commence negotiations when they were already under way, (16) secretly negotiated to sell SHS to one of three investor-owned companies, (17) conducted back-to-back meetings with investors to facilitate the sale of SamCor, (18) prepared SHS for sale subject only to an asset audit, (19) engaged in unauthorized board operations, and (20) misled the board by letting them think that negotiations were not ongoing.

#### a. *Falsity*

■ The undisputed evidence at trial established that the ad hoc committee included six board members and that 12 of the 18 members of SamCor's board of directors were not privy to the activities of the ad hoc committee. The responsibilities of SOTF, a subcommittee of the planning committee, were illusory when contrasted

with the extensive undertakings of the ad hoc committee. The evidence established that at the June 5, 1984, board meeting, the board was not advised that the ad hoc committee was actively engaged in negotiations with three for-profit entities. The board was also not told of the ad hoc committee's meetings with high ranking representatives of the three prospective purchasers, the compilation of an asset valuation, and the mailing of requests for proposals. At neither of the two SOTF meetings conducted between the time that Morris created the ad hoc committee and the June 20, 1984, board meeting did Morris or anyone else describe the wide ranging activities of the ad hoc committee. On June 25, 1984, the chairman of the board of HRCA told Warner that HRCA was prepared to purchase SHS subject only to a "review of the books...."

Morris's allegations that Warner made false statements concerning negotiations for the sale of SHS and Morris's failing to advise the board of developments are not supported by substantial evidence.

### b. *Actual Malice*

The general possibility of a sale of SHS was mentioned in Warner's presence on more than one occasion. On June 1, 1984, Warner attempted to substantiate rumors he heard about the sale of SHS. Morris told Warner only that DWR had been retained to do an asset valuation and that a possible purchaser in Houston had been contacted. Around June 22, 1984, Warner received telegrams notifying him that unscheduled board meetings had been calendared for June 27 and June 28, 1984. Warner concluded that these involved plans to sell SHS. On June 24, 1984, Warner obtained jet logs for the corporate jet and verified his suspicions regarding meetings with prospective purchasers. On June 25, 1984, Warner learned in a conversation with HRCA's chairman of the board that HRCA was prepared to purchase SHS. As-

suming arguendo that one or more of the remaining statements was false, clear and convincing evidence of actual malice was absent.[6]

### 2. Lease and Use of Aircraft

■ In his complaint, Morris alleged that Warner defamed him when Warner stated that Morris purchased a corporate jet without board authority and that the jet was used in violation of a board resolution.

### a. *Falsity*

Substantial evidence was presented that these statements were false in some important respects. The corporate jet was not purchased by SamCor but rather was acquired by its subsidiary DynaCor through a lease/purchase agreement. Warner admitted that the DynaCor board had authorized acquisition of the aircraft. In addition, the November 17, 1983, board minutes of Sam-Cor reflect that the SamCor board was notified that DynaCor had acquired the corporate jet.

### b. *Actual Malice*

■ We next turn to our independent examination of the record to determine whether Warner made these statements with actual malice. The November 17, 1983, minutes reflect only that the SamCor board was notified during a multiple-topic report that the "SamCor network" had access to a jet aircraft acquired by DynaCor through a lease/purchase agreement. Approval of the report does not establish that the SamCor board authorized the lease before it was executed or even that it retroactively authorized the lease. At the April 26, 1984, SamCor board meeting, Warner's motion that SamCor's connection to the aircraft be expeditiously terminated was passed. In addition, notwithstanding the revised minutes of that meeting, the tape-recording of that meeting indicates that Warner's motion also required SamCor to

---

**6.** Although Warner also suggests that allegedly defamatory representations in a written statement submitted by Warner to the SamCor board of directors were privileged based upon duty, *see, Restatement (Second) of Torts*, § 595, *Aspell*

*v. American Contract Bridge League,* 122 Ariz. 399, 400, 595 P.2d 191, 192 (App.1979), we need not reach this issue in view of our ruling regarding sufficiency of the evidence.

forego further use of the aircraft. This vote followed a discussion during which several board members stated that the board had neither discussed nor authorized acquisition of the corporate jet. It is undisputed that members of the ad hoc committee used the aircraft to travel to meetings in Tennessee, Texas, California, and Colorado to meet with prospective purchasers of SHS.

Our independent examination of the record indicates that clear and convincing evidence was lacking that Warner made these statements knowing they were false or with reckless disregard for the truth.

3. Bylaws

■ Morris alleged that Warner defamed him when Warner stated that Morris rewrote corporate bylaws without board approval, that the board was powerless to stop the sale of SHS because of articles and bylaw provisions pushed through by Morris, and that Morris amended the bylaws and thereby took control. Warner admitted saying that Morris had been successful in amending bylaws. Warner had consented to amendment of the bylaws in 1982. Warner also admitted that the board could stop a sale of the assets. Accordingly, Warner's statement that the board was powerless to stop a sale was false and known by Warner to be false. However, this broad statement did not defame Morris and cannot support the award of damages. The allegedly defamatory publication does not reflect that Warner stated that Morris rewrote the articles of incorporation and the bylaws. Even assuming such statements could support the award of damages, no substantial evidence of publication exists as to this allegation.

4. Resignation

■ Morris alleged in his complaint that Warner defamed him when Warner stated that "several SamCor board members asked Morris to resign as Chairman of the Board of SamCor during the week prior to June 22" and that Morris "refused to step down."

a. *Falsity*

Conflicting evidence exists regarding these allegations. We must therefore next consider whether these statements attributed to Warner were made with actual malice.

b. *Actual Malice*

Evidence was presented that Warner, in the presence of board members Tostenrud and Patterson, discussed the possibility of Morris's resignation. This discussion occurred on June 1, 1984. Morris himself admitted that some members of the board of directors discussed the possibility of his resignation with him. Our independent examination of the record indicates that proof of actual malice by clear and convincing evidence was not present.

5. Miscellaneous Statements

■ Morris's complaint alleged that Warner defamed him by stating that Morris had compromised himself, Morris was going to become a consultant for HCA, and that Morris's credibility was close to zero.

AMI's proposal, submitted in response to the RFP stated that AMI hoped to retain Morris as a consultant. Uncontradicted evidence was also presented that "special meetings" were held with representatives from HCA, AMI, and HRCI by a representative of DWR. DWR had been retained by the ad hoc committee for financial advice. At each of these meetings, representatives of HCA, AMI, and HRCA discussed future employment prospects for Morris in the event that their respective companies succeeded in acquiring SHS. In addition, Warner had learned from a representative of HRCA of an offer of employment to Morris by one of the prospective purchasers.

No substantial evidence was presented that these statements were false. Finally, even assuming arguendo that the statements were false, clear and convincing evidence of actual malice is absent.

CONCLUSION

As to many of the thirty allegedly defamatory statements, substantial evidence that

the statements attributed to Warner were false or were published was not present. In the remaining instances, clear and convincing evidence that Warner made the statements with actual malice was absent. We reverse the judgment against Warner and remand this matter with directions for entry of judgment in favor of Warner.

LACAGNINA, C.J., and HOWARD, J., concur.