2012 COA 207

**Mark V. SHOEN, Plaintiff–Appellant,**

v.

**Dr. Samuel SHOEN, Defendant–Appellee.**

**No. 11CA2553.**

Colorado Court of Appeals, Div. V.

Nov. 21, 2012.

Wheeler Trigg O'Donnell, LLP, John M. Vaught, LaMar F. Jost, Kelly A. Laudenslager, Denver, Colorado, for Plaintiff–Appellant.

Senter Goldfarb & Rice, LLC, Eric M. Ziporin, Billy–George Hertzke, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge FOX.

¶ 1 Plaintiff, Mark V. Shoen, appeals the judgment entered in favor of defendant, Dr. Sam Shoen, following a jury trial on Mark's defamation claims. We affirm.

## I. Background

¶ 2 L.S. Shoen, the founder of U–Haul International, Inc., had twelve children, including Sam and Mark. L.S. distributed shares of U–Haul stock to each of his children.

¶ 3 In the mid–1970s, a rivalry over U–Haul's management began among L.S.'s four eldest sons—Sam, Mark, Joe, and Michael. The Shoen family split into two factions, with L.S. and Sam in the group known as the "outsiders," and Mark and Joe in the group known as the "insiders." After the "insiders" accumulated a controlling interest and decided that L.S. was no longer fit to run U–Haul, the "outsiders" filed a shareholders' derivative suit against U–Haul's parent company, AMERCO. *See Shoen v. AMERCO,* 885 F.Supp. 1332 (D.Nev.1994), *vacated by settlement,* (D.Nev. No. CV–N–94–0475–ECR, Feb. 9, 1995). The U–Haul litigation and the Shoen family rivalry were the sub-

ject of multiple media reports, including a July 1990 *Wall Street Journal* front page story.

¶ 4 In August 1990, Sam's wife, Eva, was murdered in their home in Telluride, Colorado. The Sheriff's Department's investigation disclosed the following evidence:

- Eva's body was found at the top of the staircase outside of her bedroom;
- A piece of a bloody bed sheet was removed but never found, although a blood-stained mattress remained;
- No blood was found between Eva's bed and where her body was found at the top of the staircase;
- Eva's bedroom was in disarray, suggesting that a struggle had ensued;
- Money and jewelry were in plain view, but nothing was taken from the home except for a cut-out from the bloody bed sheet;
- Eva was killed by a gunshot wound in her back;
- Two needle mark injection sites, believed to have been made shortly before Eva was shot, were found on each side of Eva's chest; and
- Sam was in Arizona when Eva was murdered.

¶ 5 After the murder and at Mark's direction, U–Haul sent its attorney and private investigators to Telluride. The lead detective for the Sheriff's Department declined U–Haul's investigators' request to work alongside the Sheriff's Department. The U–Haul investigators conducted surveillance on Sam, and passed inaccurate or unsubstantiated information about Sam to the Sheriff's Department. The transmitted unsubstantiated information included allegations that Sam had affairs while he was married to Eva, was stopped by police for speeding in Phoenix on the day Eva was murdered, and was overheard confessing to the murder.

¶ 6 In 1993, the Sheriff's Department attempted to get additional leads and information by setting up an episode about the murder investigation on *Unsolved Mysteries*. After the episode was broadcast, an individual called with a tip that led law enforcement to Frank Marquis, who eventually confessed

to killing Eva. In 1994, Marquis pled guilty to manslaughter and burglary of other Telluride homes. He received a twenty-four-year sentence.

¶ 7 Marquis confessed that when he killed Eva, he was visiting Telluride to burglarize drug dealers' houses. Marquis claimed he shot Eva next to her bed and she ran to the top of the stairs. Marquis denied any knowledge of the injection sites on Eva's body and claimed he acted alone. Although Marquis said that he was not bleeding in the Shoens' home, he claimed that he cut out the piece of bloody bed sheet because he thought some of the blood might be his. Marquis did not explain why he did not also take all or part of the bloody mattress underneath the bed sheet.

¶ 8 In 2007, cable channel TruTv producers contacted Sam to interview him for an episode about Eva's murder on the show *Dominick Dunne's Power, Privilege, and Justice.* The episode, entitled *Tragedy in Telluride,* was broadcast nationwide in January 2008. Mark's defamation suit followed.

¶ 9 Before trial, the court ruled that some statements made by Sam on the *Tragedy in Telluride* episode were defamatory per se. Following a two-week trial, a jury found that Mark did not prove (1) by a preponderance of the evidence that the defamatory statements caused him damages, (2) by clear and convincing evidence that the statements were false, and (3) by clear and convincing evidence that Sam knew that the statements were false or made the statements with reckless disregard as to whether they were false. Jury findings (2) & (3) required the more stringent clear and convincing standard of proof because the trial court determined that the matter was one of public concern, and that Mark was a limited purpose public figure.

¶ 10 Mark appeals on grounds that the trial court erred by finding that (1) Colorado law applied, (2) the matter was of public concern, and (3) Mark was a limited purpose public figure.

## II.  Standard of Review

¶ 11 Mark's appeal raises questions of law, which we review de novo. *See Paratransit*

*Risk Retention Group Ins. Co. v. Kamins*, 160 P.3d 307, 314 (Colo.App.2007) (a trial court's choice of law ruling is reviewed de novo); *see also McIntyre v. Jones*, 194 P.3d 519, 525–27 (Colo.App.2008) (appellate courts review de novo questions about whether a matter is one of public concern and whether an individual is a limited purpose public figure).

¶ 12 Mark's choice of law argument raises a question of waiver, which we review for an abuse of discretion. *See Public Serv. Co. v. Blue River Irrigation Co.*, 753 P.2d 737, 741 (Colo.1988); *Vanderpool v. Loftness*, 2012 COA 115, ¶ 19, —— P.3d ——, 2012 WL 2581047. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous application of the law. *Vanderpool*, ¶ 19.

### III. Choice of Law Waiver

¶ 13 Mark contends that Arizona law should apply to his claims, and that the trial court erred in applying Colorado law. Mark believed Arizona law was more favorable to his claims.[1] We conclude Mark waived this issue.

¶ 14 Although Mark resides in Arizona, and Sam resides in Washington, Mark chose to file his complaint in Colorado on January 23, 2009. Mark did not ask the court to apply Arizona law until May 11, 2011, almost twenty-eight months later. During that time, the parties filed multiple pleadings and motions, and the trial court ruled on two motions to dismiss, a motion to strike, two motions for summary judgment, a motion for a determination of a question of law, and several motions for reconsideration. The parties consistently relied on Colorado law and the trial court applied Colorado law, without objection from Mark.

¶ 15 The issue before us one of first impression because there is no Colorado case law addressing whether a party can waive a

choice of law argument. In the absence of Colorado case law directly on point, we consider other state and federal case law for guidance. *See, e.g., Lujan v. Life Care Centers*, 222 P.3d 970, 974–75 (Colo.App.2009) (finding the reasoning in out-of-state cases persuasive and applying the same analysis to the case before it).

¶ 16 The First Circuit explained in a factually similar case that, although parties sometimes explicitly agree about what law governs, parties often achieve "a satisfactory consensus on the critical choice-of-law issues" "through the natural implication of their [assertions]." *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991). In *Borden*, the parties and the trial court consistently cited Rhode Island law for the plaintiff's claims, and relied upon Massachusetts law for the defendant's counterclaim. *Id.* The defendant argued for the first time on appeal that Florida law should apply to his counterclaims. *Id.* The First Circuit rejected the defendant's position, ruling that, "[i]n the absence of exceptional circumstances ... a litigant is bound by a plausible choice of law which it successfully urged the trial court to follow." *Id.; see also Global Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839, 845 (8th Cir.2009) ("[It is improper] to allow [a party] to alter its posture as to choice of law when it invited the district court to apply [a different state law than it argues for on appeal].").

¶ 17 Applying this principle, we hold that a party waives a choice of law argument if it fails to raise the issue before the trial court rules on dispositive issues relying on the disputed state law. *See* Restatement (Second) of Conflict of Laws § 136(1)-(2) cmts. (c) & (h) (when neither party refers to foreign law "in the pre-trial stages," the court "will usually decide the case" under local law); *see also Commerce Bank v. Ogden, Newell & Welch*, 81 F.Supp.2d 1304,

---

1. Under Arizona Law, if the declarant makes a statement about a public figure or a matter of public concern, the jury must prove all elements of defamation by a preponderance of the evidence, except actual malice, which must be established by clear and convincing evidence. *See Morris v. Warner*, 160 Ariz. 55, 770 P.2d 359, 366 (Ariz.App.1988) (public figure); *Scottsdale Pub.,* *Inc. v. Superior Court In and For Cnty. of Maricopa*, 159 Ariz. 72, 764 P.2d 1131, 1142 (Ariz.App. 1988) (matter of public concern). Thus, Colorado law requires the same standard of proof to establish damages and actual malice, but requires a higher standard of clear and convincing evidence to establish that the statements were false. *See McIntyre*, 194 P.3d at 524.

1312 (M.D.Fla.1999) (defendants waived their choice of law arguments in the district court where thousands of pages of material and dozens of motions had already been filed in the case), *aff'd in part and rev'd in part on other grounds sub nom. Porter v. Ogden, Newell & Welch*, 241 F.3d 1334 (11th Cir. 2001); *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 146 (Ind.1999) ("[I]f the adverse party is not given reasonable notice that ... another state's law will be raised, then any choice of law question is waived....").

¶ 18 Although Mark did not wait until his appeal before raising the choice of law issue, *cf. Borden*, 935 F.2d at 375, he waited until after the trial court had issued rulings in his favor and had decided that he was a limited public figure. Under these circumstances, we conclude that Mark waived any argument that Arizona law applies to the dispute. *See, e.g., Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir.2012) (the parties waived any objection to application of Illinois law, where they did not address choice of law until appearing for trial after four years of litigating the case under Illinois law); *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 n. 15 (11th Cir.1995) (rejecting argument as to choice of law where plaintiff "acquiesced in the court's choice of law decision throughout the trial, changing course only after the court granted" defendant's motion for judgment as a matter of law).

## IV. Defamation

¶ 19 Mark contends that the trial court erred in finding that the matter was of public concern and he was a limited purpose public figure and thus applying a higher burden of proof. We conclude the trial court applied the correct burden of proof because the matter was of public concern, and we need not address the public figure issue.

### A. Burden of Proof

██ ¶ 20 "At common law, the tort of defamation existed to redress and compensate individuals who suffered serious harm to their reputations due to the careless or malicious communications of others." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo.1994). Today, a cause of action for the tort of defamation exists "to protect individuals from those who would inflict an invidious and careless harm." *Id.* "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring).

██ ¶ 21 However, "[t]he interest in protecting an individual's reputation is not paramount in all circumstances. It must be weighed against society's interest in encouraging and fostering vigorous public debate, an interest protected by the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution." *McIntyre*, 194 P.3d at 524. Thus, unlike defamatory statements of a purely private nature, those involving a matter of public concern are afforded additional protection, requiring a heightened burden of proof for a plaintiff in a defamation action. *Williams v. Continental Airlines, Inc.*, 943 P.2d 10, 17 (Colo.App.1996). If the statement involves a matter of public concern, the plaintiff must prove the falsity of the statement by clear and convincing evidence, instead of by a preponderance of the evidence. *Id.*

¶ 22 Because this heightened burden applies if either the matter is of public concern or Mark is a limited public figure, we may affirm the trial court's ruling on either ground.[2] *See McIntyre*, 194 P.3d at 525–27 (the same burden of proving the falsity of the statement by clear and convincing evidence applies to a plaintiff who is a limited public figure as to statements involving matters of public concern); *see also Diversified Man-*

---

**2.** In 1991, Mark filed a defamation case against L.S. in Arizona for statements L.S. made on television shows accusing Mark and Joe of involvement in Eva's murder. The district court in that case ruled that Mark was a limited purpose public figure. *See Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir.1995).

*agement, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106, 1109 n. 1 (Colo.1982).

### B. Matter of Public Concern

¶ 23 Mark contends that the three statements before the jury, which the trial court ruled to be defamatory per se, did not implicate a matter of public concern. We disagree.

¶ 24 According to Mark, Sam made the following statements during the interview for *Tragedy in Telluride:*

1.  [Mark and Joe] were people whose father gave them everything they ever had. When they got the opportunity they did everything within their power to destroy their father both professionally, financially and every other way and they did it in a completely ruthless fashion. So yeah, if they are capable of doing that to their own father they are certainly capable of evil things.

2.  There was a piece of bloody sheet on the bed that was cut out and removed. So again, if someone was trying to implicate me in a murder, that would have been a valuable piece of evidence to plant. I suspect that the whole thing was staged to implicate me and that it didn't work the way they intended.

3.  [When asked whether he shared his father's suspicion that one of his brothers was "some way involved" in Eva's murder] Well, I didn't know, I knew that they were certainly capable of it and pretty much anyone who knows them will say that.[3]

Because the trial court ruled that the statements implicated a matter of public concern, Mark had the burden of proving by clear and convincing evidence that the statements were false when published, and that Sam made the statements with reckless disregard for their truth or falsity.[4]

¶ 25 While much of Mark's appellate argument centers on whether he was a limited public figure, we need not reach that issue where we conclude that Sam's statements related to a matter of public concern.

> The boundaries of public concern cannot be readily defined, but must be determined on a case-by-case basis. Generally, a matter is of public concern whenever "it embraces an issue about which information is needed or is appropriate," or when "the public may reasonably be expected to have a legitimate interest in what is being published."

*Williams,* 943 P.2d at 17 (quoting *Lewis v. McGraw-Hill Broadcasting Co.,* 832 P.2d 1118, 1121 (Colo.App.1992)); *see also City of San Diego v. Roe,* 543 U.S. 77, 83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (noting that public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public"). Sam made the statements during a two-hour interview, in which—among other things—he criticized the quality and completeness of the Sheriff's investigation. According to Sam, law enforcement officers "never have" completely "solved" Eva's murder. "[W]here the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth." *Garrison v. Louisiana,* 379 U.S. 64, 72–73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions ... are without question events of legitimate concern to the public...." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *see also Bowers v. Loveland Publ'g Co.,* 773 P.2d 595, 596 (Colo.App.1988).

¶ 26 Mark argues that Eva's murder was not an event of legitimate concern to the

---

3.  Our review of the *Tragedy in Telluride* episode, which is in the record, indicates that the third statement was not included in the broadcast. We include it here because the statement was included in the jury instructions. However, the existence of the third statement does not affect our analysis. The two statements in the broadcast comprise approximately 46 seconds of the 43 minutes and 40 seconds broadcast.

4.  As noted above, the jury concluded that Mark failed to prove that (1) the statements were false, (2) Sam made the statements with actual malice, and (3) Mark sustained damages.

public when *Tragedy in Telluride* was broadcast in 2008 because the case was closed after Marquis' 1994 conviction. Marquis did not even surface as a suspect until an *Unsolved Mysteries* episode was broadcast nationally. The U–Haul family litigation unfolded over many years and was interrupted by Eva's murder. The events were sufficiently interesting that author Ronald Watkins wrote a book titled *Birthright* about the family and the murder. The record reflects that the jury was advised that one of the producers of *Power, Privilege, and Justice* explained to Sam their decision to broadcast an episode about the murder of the wife of a wealthy and prominent businessman and its investigation as follows:

> I know you were curious as to why we were specifically interested in this case, and what I can say about that is simply that there is great general interest among television viewers in fascinating true stories with interesting characters and real life dramas, and for better or for worse, this case certainly has those elements. It merited a book length treatment by Watkins, and it seems to us to be a very compelling story for television documentary treatment.

*See Ramsey v. Fox News Network, L.L.C.,* 351 F.Supp.2d 1145, 1147 (D.Colo.2005) (concluding that the 1996 unsolved murder of a six-year-old was a matter of public concern when a broadcast about the investigation was televised nationally in 2002, six years after the murder); *see also Patrick v. Cleveland Scene Publ'g,* 582 F.Supp.2d 939, 951–52 (N.D.Ohio 2008) (holding that 2004 magazine article questioning a physician's medical training and the validity of his self-proclaimed role in developing the Heimlich–Maneuver in the 1970s involved a matter of public concern), *aff'd,* 360 Fed.Appx. 592 (6th Cir.2009) (unpublished opinion).[5] And Sam's statements related to a matter of public concern because they addressed his views about the adequacy of the investigation by public law enforcement officers when unanswered questions remained. *See Garrison,* 379 U.S. at 72–73, 85 S.Ct. 209. The following portions of the record substantiate the public's interest in the event:

- The victim was a family member of the well-known U–Haul company owner;

- Members of the family were involved in a contentious multimillion dollar lawsuit against each other when the murder happened;

- Mark's private investigators passed inaccurate information to the Sheriff's Department implicating Sam in the murder;

- Marquis' confession did not explain, among other things, (1) the presence of injection sites on Eva's body, (2) the missing bed sheet, or (3) how Eva reached the top of the stairs without leaving any trace of blood after being shot, given a doctor's testimony that she would have been unconscious within seconds after being shot; and

- Marquis' plea agreement documented the prosecution's belief that, at that time, unanswered questions about the murder remained.

---

**5.** The timing issue Mark's counsel emphasized in oral argument occasionally comes up in the context of public figures, which we do not consider here. The Supreme Court has explicitly declined to address the question "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 166 & n. 7, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Circuit courts addressing the issue, however, have concluded that "once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy." *Street v. National Broad. Co.,* 645 F.2d 1227, 1234–35 (6th Cir.1981) (holding that the main witness in the famous Scottsboro Nine rape case remained a public figure forty years later); *see also Partington v. Bugliosi,* 56 F.3d 1147, 1152 n. 8 (9th Cir.1995) ("it appears that every court of appeals [addressing the temporal element of public figure status] has concluded that the passage of time does not alter an individual's status as a limited purpose public figure"); *accord Milsap v. Journal/Sentinel, Inc.,* 100 F.3d 1265, 1269–70 (7th Cir.1996) (concluding that the founder of a 1960s newspaper was a public figure for purposes of defamation action based on editorial column published 25 years later); *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 619 (2d Cir.1988); *Brewer v. Memphis Publ'g Co.,* 626 F.2d 1238, 1256 (5th Cir.1980); *Time, Inc. v. Johnston,* 448 F.2d 378, 381–82 (4th Cir.1971).

¶ 27 Although the event was not being actively investigated when *Tragedy in Telluride* was broadcast, legitimate public concerns remained about the completeness of the original criminal investigation, and whether the murder remained partially "unsolved." *See Garrison,* 379 U.S at 72–73, 85 S.Ct. 209; *Ramsey,* 351 F.Supp.2d at 1147. We conclude there was no error in the trial court's ruling that the case involved matters of public concern, and thus Sam's statements were subject to constitutional protection under the higher burden of proof. *See Bowers,* 773 P.2d at 596.

¶ 28 The judgment is affirmed.

Judge MILLER concurs.

Judge CARPARELLI specially concurs.

Judge CARPARELLI specially concurring.

¶ 29 I concur in the result, but write separately because, unlike the majority, I conclude that it is not necessary to substantiate actual public concern. I also conclude that Sam's statement that law enforcement officials should have continued investigating his wife's murder is not necessary to the resolution of this appeal.

Speech on matters of public concern is "at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–59, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (quoting *First National Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). To determine whether speech addresses a matter of public concern, courts consider its content, form, and context. *Id.* at 761, 105 S.Ct. 2939; *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "Public concern 'is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.'" *Hoeper v. Air Wisconsin Airlines Corp.,* 232 P.3d 230, 241 (Colo.App. 2009) (quoting *City of San Diego v. Roe,* 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)), *aff'd,* 2012 CO 19, —— P.3d ——, 2012 WL 907764. "Public concern is interpreted broadly." *Id.*

¶ 30 "Somewhat more specifically, a matter is of public concern when 'it can be fairly considered as relating to any matter of political, social, or other concern to the community.'" *McIntyre v. Jones,* 194 P.3d 519, 525 (Colo.App.2008) (quoting *Barrett v. Univ. of Colo. Health Sciences Center,* 851 P.2d 258, 263 (Colo.App.1993)). "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from prosecutions ... are without question events of legitimate concern to the public...." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

¶ 31 Sam's statements about Mark that were broadcast in the television program and that Mark alleges were defamatory can be summarized as follows:

- Mark and Joel tried to destroy their father professionally and financially;
- they were ruthless;
- they were capable of evil things;
- Sam believed someone staged Eva's murder to implicate him; and
- Sam did not know whether Mark and Joel were involved in Eva's murder, but he knew that they were capable of it, and others who knew them would agree.

¶ 32 We must consider the content, form, and context of Sam's statements to determine whether they address a matter of public concern. *Connick,* 461 U.S. at 145, 103 S.Ct. 1684. The content of Sam's statements relate to his wife's murder and questions about the identity of the murderer or murderers. The form was the cable television transmission of a video of Sam's oral statements. The context was a television program about the murder, its investigation, and remaining questions about the identity of the murderer or murderers.

¶ 33 It can fairly be said that violent crimes, the investigation of such crimes, and the identification, prosecution, and conviction of alleged perpetrators are of legitimate concern to the public. *See Cox Broadcasting,* 420 U.S. at 492, 95 S.Ct. 1029; *see also Bowers,* 773 P.2d at 596. In my view, whether a matter is one of legitimate public con-

cern depends on the foregoing considerations regardless of whether the public was previously aware of the matter or demonstrated concern about it. Although the involvement of well-known individuals, intrigues, evidentiary inconsistencies, and doubts about the guilt of the person convicted might cause the public to find the matter more interesting, active public interest is not necessary to determine whether a matter is of legitimate public concern.

¶ 34 In a portion of the interview that was not televised, the interviewer asked Sam whether he thought "they should have continued investigating." Sam responded:

> You know, of course the answer is " 'yes.' " But investigate what? You have to have something, some kind of fact, or suspicion which you want to investigate. And that was a problem from the very beginning of the whole thing. They didn't have anything. They had nothing whatsoever to investigate. They had no leads. And had Marquis's brother[-]in[-]law, who, by the way, got the reward, not come forward and claim that Marquis told him about it, we'd still not have anybody arrested because there was no evidence.

¶ 35 To the extent that this untelevised statement was critical of the investigation, it is not necessary to the determination of whether the televised statements related to matters of legitimate public concern. In addition, I do not concur in the majority's reliance on *Garrison v. Louisiana*, 379 U.S. 64, 65–66, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), as a basis for determining whether the statements addressed matters of public concern. There, the defendant was convicted for criminal defamation of public officials and the

Supreme Court ruled that Louisiana's criminal defamation statute was unconstitutional as applied. *Id.* at 67, 85 S.Ct. 209.[6] Here, we have a civil suit in which the plaintiff was not a public official.

---

**6.** In *Garrison*, 379 U.S. at 65–66, 85 S.Ct. 209, a district attorney held a press conference at which he disparaged judicial conduct. Among other things, he said that (1) the large backlog of pending criminal cases was the result of inefficiency, laziness, and excessive judicial vacations; and (2) the judges had hampered his criminal investigations of vice by refusing to authorize funds to pay for undercover investigations. The Attorney General of Louisiana prosecuted the district attorney, who was then tried and convicted of criminal defamation based on those statements. The Supreme Court considered "whether the historical limitation of the defense of truth in criminal libel to utterances published 'with

good motives and for justifiable ends' should be incorporated into the *New York Times* rule as it applies to criminal libel statutes." *Id.* at 70–71, 85 S.Ct. 209. The Supreme Court reversed, ruling that the Louisiana statute "incorporates constitutionally invalid standards in the context of criticism of the official conduct of public officials." *Id.* at 77, 85 S.Ct. 209. It was in that context that the Supreme Court said, among other things, that "where the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest secured by the Constitution, in the dissemination of truth." *Id.* at 72–73, 85 S.Ct. 209.